STATE OF CONNECTICUT *v.* AFSCME, COUNCIL 4,
LOCAL 2663, AFL-CIO
(AC 19209)

Lavery, C. J., and Landau and Hennessy, Js.

---

Argued May 31—officially released September 12, 2000

*J. William Gagne, Jr.*, with whom, on the brief, was *Jason W. Cohen*, for the appellant (defendant).

*Beth Z. Margulies*, assistant attorney general, with whom, on the brief, were *Richard Blumenthal*, attorney general, and *Charles A. Overend*, assistant attorney general, for the appellee (plaintiff).

*Opinion*

LAVERY, C. J. The defendant, AFSCME, Council 4, Local 2663, AFL-CIO, appeals from the judgment of the trial court vacating an arbitrator's award that ordered the reinstatement of a union member who had been dismissed from his position as a driver of children for the department of children and families (department). The defendant contends that the union member should be reinstated because the court improperly vacated the arbitration award on the ground that it is violative of public policy. We affirm the judgment of the trial court.

The following facts are relevant to this appeal. The grievant, William Unwin, was hired by the department on March 17, 1995, as a social services assistant. His work required him to drive children entrusted to the care or custody of the department.[1]

On January 21, 1994, police, pursuant to a search warrant, searched Unwin's home and found illegal drugs. He subsequently was arrested, and on February 7, 1996, pleaded guilty to felony charges of possession of marijuana with intent to sell in violation of General Statutes § 21a-277 (b) and possession of cocaine with intent to sell in violation of General Statutes § 21a-278 (b). Unwin received a seven year suspended sentence with three years of probation. He informed the department of his conviction in April, 1996. The state discharged him on July 29, 1996, in light of the conviction, on the ground that it had just cause to do so.

The defendant submitted to arbitration a grievance on Unwin's behalf. The issues at arbitration were whether Unwin properly was fired for just cause and, if not, what the remedy should be consistent with the governing collective bargaining agreement. An arbitration hearing was held on July 2, 1997. On August 11, 1997, the arbitrator issued an award reducing the dismissal "to a suspension to end with his first day of work, following receipt of this award." The plaintiff sought to have the trial court vacate the arbitrator's award. On February 23, 1999, the court vacated the award, and the defendant thereafter appealed.

1

The defendant contends that Unwin should be reinstated because the court improperly vacated the arbitration award as violative of public policy. We disagree.

---

[1] The court stated that the circumstances of Unwin's driving, such as location, duration, age and numbers of children involved, time involved and other collateral duties, were not part of the record.

The standard of review relative to arbitration awards depends on the nature of the challenge. With a voluntary, unrestricted submission to an arbitrator, as is the case before us, the court "may only examine the submission and the award to determine whether the award conforms to the submission." (Internal quotation marks omitted.) *Hartford* v. *International Assn. of Firefighters, Local 760,* 49 Conn. App. 805, 814, 717 A.2d 258, cert. denied, 247 Conn. 920, 722 A.2d 809 (1998). In making such a comparison when the submission is unrestricted, the court will not review the evidence or legal questions involved, but is bound by the arbitrator's legal and factual determinations. *Game-A-Tron Corp.* v. *Gordon,* 2 Conn. App. 692, 695, 483 A.2d 620 (1984).

Certain conditions do exist, however, under which we conduct a more searching review of arbitral awards. In *Garrity* v. *McCaskey,* 223 Conn. 1, 6, 612 A.2d 742 (1992), our Supreme Court reiterated that there are three grounds for vacating an award when the submission is unrestricted. These grounds arise when the award (1) rules on the constitutionality of a statute, (2) violates clear public policy or (3) contravenes one or more of the statutory proscriptions of General Statutes § 52-418. Our discussion focuses on the second prong.

The proper standard of review for examining whether an arbitral decision violates a clear public policy was recently articulated in *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.,* 252 Conn. 416, 429, 747 A.2d 1017 (2000), in which our Supreme Court stated: "Where there is no clearly established public policy against which to measure the propriety of the arbitrator's award, there is no public policy ground for vacatur. If, on the other hand, it has been determined that an arbitral award does implicate a clearly established public policy, the ultimate question remains as to whether the award itself comports with that policy. We conclude that where a party challenges a consensual arbitral

award on the ground that it violates public policy, and where that challenge has a legitimate, colorable basis, de novo review of the award is appropriate in order to determine whether the award does in fact violate public policy."

*Schoonmaker* also cautions that the question of whether a public policy issue is in fact implicated should not be brushed aside. The court stated: "We emphasize, however, that a party raising such a challenge to an arbitral award may not succeed in receiving de novo review merely by labeling its challenge as falling within the public policy exception to the normal rule of deference. The substance, not the form, of the challenge will govern. Thus, the court should not afford de novo review of the award without first determining that the challenge truly raises a legitimate and colorable claim of violation of public policy. If it does raise such a claim, de novo review should be afforded. If it does not, however, the normal deferential scope of review should apply." Id., n.7.

We interpret *Schoonmaker* to require a two-step analysis in cases such as this one in which a party raises the issue of a violation of public policy in a arbitral award. First, we must determine whether a clear public policy can be identified. Second, if a clear public policy can be identified, we must then address the ultimate question of whether the award itself conforms with that policy.

A

We first determine whether a clear public policy is implicated in this case. "A public policy challenge to an arbitration award is rooted in the principle that the parties cannot expect conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." (Internal quotation

marks omitted.) *Hartford* v. *International Assn. of Firefighters, Local 760*, 49 Conn. App. 813. "Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Internal quotation marks omitted.) *Groton* v. *United Steelworkers of America*, 252 Conn. 508, 519–20, 747 A.2d 1045 (2000).

The public policy that must be considered, as stated by the trial court in its memorandum of decision, is "the policy against [the department] employing persons on probation, following a conviction for felony drug offenses, including possession with intent to sell, to drive children in its care and custody." In essence, we must consider whether providing a safe and nurturing environment for children under the department's care is a clear public policy. We agree with the court's conclusion that ample sources exist that clearly show that the protection of children, particularly those in the department's care, is a clear, well-defined, dominant and compelling public policy of this state.

That the protection and nurturing of children is an important public policy is almost too obvious for discussion. General Statutes § 17a-101 (a) provides without equivocation: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect [and] . . . to provide a temporary or permanent nurturing and safe environment for children when necessary . . . ." This policy has been extensively cited in our case law. E.g., *In re Eden F.*, 250 Conn. 674, 692 n.20, 741 A.2d 873 (1999). Indeed, the best interests of chil-

dren are the fundamental underpinning of whole areas of law. E.g., General Statutes § 45a-706 (rule of construction that various parental termination and adoption provisions shall be construed in best interest of any child for whom petition is filed under said sections); *In re Eden F.*, supra, 689 (best interest of child always paramount consideration and usually dictates outcome in custody proceedings).

We need not belabor this point further. "[T]he continuing welfare of the child is a matter of legitimate state interest." *In re Juvenile Appeal (85-3)*, 3 Conn. App. 194, 198, 485 A.2d 1369, cert. denied, 196 Conn. 801, 491 A.2d 1105 (1985). The protection of children from harm, the underlying public policy in this case, is well settled and dominates our jurisprudence. The department has statutorily based obligations to maintain and support children under its care that must be followed. Accordingly, we conclude that the protection of children, with specific reference to the department, is a clear public policy of this state.[2]

---

[2] Indeed, our Supreme Court, discussing in dicta in *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 434–35 n.11, an example of a legitimate public policy, highlighted an interest in protecting children similar to that in the matter before us. The court examined with approval a New Jersey Supreme Court case that "accepted a non-delegable, special supervisory function in [the] area of child support that warrants de novo review whenever an arbitrator's award of child support could adversely affect the substantial best interests of the child." (Internal quotation marks omitted.) Id., 434 n.11, citing *Faherty* v. *Faherty*, 97 N.J. 99, 109, 477 A.2d 1257 (1984). The court drew support from *Faherty* "for the principle that a heightened standard of review is appropriate, at least in certain instances, when an arbitration award implicates a legitimate public policy." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 434–35 n.11. The court also cited with approval *Miller* v. *Miller*, 423 Pa. Super. 162, 172, 620 A.2d 1161 (1993), which held that a trial court was not bound by an arbitrator's child custody determination and must ascertain on its own whether an award is adverse to the best interests of children. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 434–35 n.11. *Schoonmaker* provides yet another reason for finding that a clear public policy in favor of protecting children exists in this jurisdiction.

B

Since a clear public policy can be identified, we must address the ultimate question of whether the arbitration award itself comports with that policy. We conclude that the arbitration award of reinstatement to Unwin conflicts with the clear public policy of protecting the children of our state.

The department has special statutory duties that must be fulfilled. For example, General Statutes § 17a-98 requires that the commissioner of children and families (commissioner) "exercise careful supervision of each child under [her] guardianship or care . . . as is necessary to promote the child's safety and his physical, educational, moral and emotional development . . . ." Department employees are responsible for the health, welfare and care of children under their supervision. General Statutes § 17a-93 (*l*).

Our case law notes a similar focus for the department. "The primary concern of [the department] is the safety of [the child]. . . . Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings. . . . *In re Christine F.*, 6 Conn. App. 360, 368, 505 A.2d 734, cert. denied, 199 Conn. 808, 809, 508 A.2d 769, 770 (1986); see also *In re Juvenile Appeal (85-BC)*, 195 Conn. 344, 352, 488 A.2d 790 (1985) (established public policy of state is to protect children); *State* v. *Anonymous*, [179 Conn. 155, 171, 425 A.2d 939 (1979)] (same)." (Internal quotation marks omitted.) *In re Shane P.*, 58 Conn. App. 244, 258–59, 754 A.2d 169 (2000).

We also examine the nature of the infraction committed by the grievant. Unwin was convicted of two counts of possession of narcotics (marijuana and cocaine) with intent to sell. The statutes making possession of drugs

with intent to sell a felony, §§ 21a-277 (b) and 21a-278 (b), are evidence of a clear intent to safeguard the public from individuals intending to sell drugs. This interest in protecting the public is even greater when applied to children. See *State* v. *Rao,* 171 Conn. 600, 610, 370 A.2d 1310 (1976) (*Bogdanski, J.,* concurring). For example, General Statutes §§ 21a-278 and 21-279 specifically prohibit drug offenses against, or even in the proximity of, children. Section 21a-278a (a) imposes an additional penalty on an adult convicted of selling controlled substances to a minor.[3]

The strong public policy against exposing children to individuals such as Unwin, who have been convicted of crimes relating to drug sales, also exists in areas within the purview of the department. General Statutes § 17a-90 (a) establishes that the commissioner "shall have general supervision over the welfare of children who require the care and protection of the state." With this responsibility comes specific duties. For example, under General Statutes § 17a-114 (b), a child cannot be placed temporarily with a relative unless that relative "attests that he and any adult living within the household have not been convicted of a crime or arrested for a felony against a person, for injury or risk of injury to or impairing the morals of a child, or for the possession, use or sale of a controlled substance . . . ."[4] Gen-

[3] There is a "well established correlation between drug dealing and firearms"; *State* v. *Cooper,* 227 Conn. 417, 426 n.5, 630 A.2d 1043 (1993); and "weapons are tools of the narcotics trade." *State* v. *Hilton,* 45 Conn. App. 207, 218, 694 A.2d 830, cert. denied, 243 Conn. 925, 701 A.2d 659 (1997), cert. denied, 522 U.S. 1134, 118 S. Ct. 1091, 140 L. Ed. 2d 147 (1998); see *State* v. *Delossantos,* 211 Conn. 258, 281, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). This correlation, stated repeatedly by our Supreme Court and by this court, depicts an additional layer of danger facing children placed under the department's care and exposed to individuals such as Unwin.

[4] At oral argument, it was noted that § 17a-114 may be inapposite because it addresses individuals who would remain with children on a continuing, overnight basis, whereas Unwin's responsibilities as a driver provided him with intermittent exposure to children. We find this argument unpersuasive.

eral Statutes § 17a-115 authorizes the commissioner to obtain arrest records of persons charged with the use or sale of any controlled substance prior to issuing a license or certification to any person for the care of a child under certain statutes.

The fact that Unwin's criminal activity occurred outside the workplace merits discussion. In *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 747 A.2d 480 (2000), Justice Peters authored a concurring opinion noting the distinction between activities inside and outside the workplace. Justice Peters commented on the case before her, stating that "[t]he fact that [the] egregious misconduct [in *AFSCME, Council 4, Local 387, AFL-CIO*] concededly occurred while the employee was on the job distinguishes it from other cases of employee misconduct in which courts have upheld arbitral awards that reduced sanctions against employees from discharge to suspension. See, e.g., *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987); *Bureau of Special Investigations* v. *Coalition of Public Safety*, 430 Mass. 601, 722 N.E.2d 441 (2000); *New York State Correctional Officers & Police Benevolent Assn., Inc.* v. *New York*, 94 N.Y.2d 321, 726 N.E.2d 462, 704 N.Y.S.2d 910 (1999) (all involving employee misconduct outside of work)." *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 479 (*Peters, J.*, concurring in the result).

In this case, we cannot accept the full implications of the reasoning of that concurrence, that is, that the commission of illegal activity inside or outside of work is a dispositive factor for determining the presence or

Exposure to illegal drugs can occur without warning and within a very short span of time. Unwin's driver position provides the individual employed in that position more than sufficient time to influence children negatively regarding drugs. That risk exposure maintains the relevance of § 17a-114.

absence of a public policy, especially the state's clear public policy on children.

The trial court properly responded to a similar concern raised by the defendant. In its memorandum of decision, the court stated: "[The] defendant asserts that off-duty conduct, given the circumstances of this case, cannot properly form the basis for a finding that public policy has been violated. The court cannot agree. By the same curious logic, someone convicted of assaulting children in their bedroom could work for [the department], driving children in its care and custody, and could be terminated only if [he or she] actually assaulted a child entrusted to [the department] while transporting [the child]. Persons engaged in the sale of drugs often fail to make tidy legal distinctions concerning where they engage in their illegal conduct and who they consort with. The court believes that where the well-being of children is involved, a more practical and nuanced approach is required than a simple analysis of where objectionable conduct has occurred."

We agree with the trial court. Improper conduct in an employee's personal life can have various effects on the employee's workplace. We consider in cases such as these the nature of the improper act, its severity and the kind of the work the employee performs. The improper acts committed by Unwin were serious felonies that involved more than possession of illegal drugs; they involved an intent to sell them. The illegal acts were not a mere shadow looming from Unwin's distant past. Rather, his guilty plea occurred concurrently with his employment at the department. Finally, Unwin's job required contact with one of the most vulnerable segments of our population—children—who, because of family and other problems, had become involved with the department.[5] Indeed, it may have been drug

---

[5] Indeed, the court rightly noted the importance Connecticut places on the safe transportation of children. In its memorandum of decision, the court stated: "Connecticut has a clear and recognized policy attaching high

use by the children's parents that landed them in the custody of the department in the first instance. In sum, Unwin committed a criminal act of a severe nature, quite recently, which had a direct negative bearing on the children under his charge. Accordingly, the fact that Unwin's criminal conduct took place outside of working hours does not mitigate the violation of public policy that occurred through his reinstatement.[6]

Indeed, Unwin, a felon twice convicted for possession of narcotics (cocaine and marijuana) with intent to sell, is the embodiment of the very kind of person that the department hopes to protect children from. At the very least, the department seeks to provide children in its care with better conditions than those to which they would be exposed without the department's interven-

---

priority to the safe transportation of schoolchildren. This policy is embodied in regulations concerning bus safety. See, e.g., Regs., Conn. State Agencies, § 14-275c-3, 'Driver to safeguard children;' § 14-275c-13, 'Daily physical requirements,' subsection f, which states that a school bus driver shall drive a school bus only on days when he has "[f]reedom from the effects of alcohol and other drugs;" § 14-275c-50, 'Notification of convictions for driver violations and driver's license suspension,' which requires school bus drivers to notify their employers of arrests or convictions for driving under the influence of alcohol or drugs or charges concerning firearms, drugs, or controlled substances; § 14-275c-51, 'Application for employment as a driver,' requiring applicants for employment as school bus drivers to provide information about criminal convictions in any jurisdiction for the past five years and requires applicants to submit to a urinalysis drug test; and § 14-275c-53, 'Annual update of driving record,' which requires an annual review of bus drivers' criminal convictions."

[6] Although the defendant points to *Norwalk Board of Education* v. *AFS-CME, Council 4, Local 1042, AFL-CIO*, Superior Court, judicial district of Stamford-Norwalk, Docket No. 161740 (March 19, 1998), for support, we find this case unpersuasive. In *Norwalk Board of Education*, a school board terminated a custodian who had pleaded guilty to possession of cocaine within 1500 feet of a school. The custodian did not hold a supervisory position over children, unlike Unwin, who, by the nature of his position, was responsible for the children under his care. See, e.g., Regs., Conn. State Agencies § 14-275c-3 (school bus driver must apply all reasonable measures to safeguard children riding on bus). Furthermore, unlike Unwin, the custodian was convicted of possession of narcotics, not the more serious crime of possession of narcotics with intent to sell.

tion. The presence of an individual convicted of two counts of possession of narcotics with intent to sell would create an opposite result in that children would be exposed to precisely the type of individual, influences and behavior from which the department is charged with protecting them.[7]

We also note with disfavor the lack of forthrightness Unwin showed to the department. While Unwin was employed with the department as a driver, he elected not to disclose his drug arrest to the department. This conduct contravenes the policy the state maintains in the closely analogous context of school bus drivers, which requires all such drivers to notify their employers of any arrest for a drug offense. Regs., Conn. State

---

[7] The defendant stated at oral argument that there is an equally persuasive opposite inference that can be drawn from Unwin's drug conviction and employment—that an individual convicted of two counts of possession of narcotics with intent to sell who retains steady employment can serve as a role model for children.

First and foremost, no support exists in the arbitrator's decision or anywhere else in the record for the notion that Unwin possessed any potential to become a role model for children in the department's care nor could this court make such a factual determination. Under the standard of de novo review *Schoonmaker* requires us to apply when considering arbitral awards involving public policy, we must "adhere to the long-standing principle that findings of fact are ordinarily left undisturbed upon judicial review." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 432 & n.8. Accordingly, we do not substitute our own judgment as to what facts should have been found by the arbitrator.

Even if we were to consider the argument on its merits, it is a dubious one and, taken to its conclusion, borders on the absurd. If we believe that the better interpretation of Unwin's drug conviction is that he stands as a role model, we turn convictions of drug possession with intent to sell into a badge of honor. Indeed, under this reasoning, prior criminal convictions are a positive trait, not a negative one, for positions in employment and elsewhere involving children. It further stands under this reasoning that the department should be hiring more convicted criminals, not less, so that children under the department's care can see that one can commit a crime and turn one's life around. This argument leads on a path that we cannot follow. Accordingly, we do not accept the defendant's view of Unwin's drug conviction.

Agencies § 14-275c-50.[8] Furthermore, Unwin let a two to three month delay occur between his guilty plea on February 7, 1996, and his reporting of his conviction to the department in April, 1996. See id.

Our decision does not cast aside the legislative interest favoring rehabilitation of criminal offenders and their obtaining meaningful employment in society. See General Statutes § 46a-79; *State* v. *Parker*, 194 Conn. 650, 663, 485 A.2d 139 (1984) (*Healey, J.*, dissenting). We endorse the concept of rehabilitation of criminal offenders as a meaningful goal. The severity of Unwin's crimes, however, combined with the responsibility for children that is called for in his former position as a driver, more than countervail any rehabilitative interest society has in Unwin.

"It is indisputable that protecting the physical and psychological well-being of children is a compelling, as well as legitimate, state interest. . . . A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens . . . ." (Citation omitted; internal quotation marks omitted.) *In re Shane P.*, supra, 58 Conn. App. 260. Common sense commands that it is utterly inappropriate to place potentially troubled children in daily contact with a convicted drug offender. An arbitrator's award that undermines the department's responsibility to protect children in such a dramatic way violates a compelling public policy, and we will not allow it to stand.

The judgment is affirmed.

---

[8] Section 14-275c-50 (c) of the Regulations of Connecticut State Agencies provides in relevant part: "Each driver shall notify his employer within three (3) days of his arrest for, conviction of or an administrative sanction as a result of any of the following offenses . . .

"(7) A felony or misdemeanor involving firearms, drugs or controlled substances."

In this opinion HENNESSY, J., concurred.

LANDAU, J., dissenting. I agree with the majority that there is an explicit, well defined and dominant public policy in this jurisdiction for the department of children and families (department) to provide a wide range of services to children in need of them. See General Statutes § 17a-3.[1] I do not agree, however, on the facts before this court, that an arbitration award reinstating the grievant to his position as a driver for the department violates that explicit public policy and that the award should be vacated pursuant to General Statutes § 52-418 (a) (4). Consequently, I dissent because (1) the trial court did not have the factual predicate necessary to conclude that the grievant supervised children in the custody of the department and that the department had a policy against employing individuals as drivers of children in its custody when those individuals have been convicted of possession of drugs with intent to sell, (2) there is no clear and explicit public policy that prohibits the state from employing individuals to provide services to the department when those individuals have been convicted of drug offenses and (3) the majority did not balance adequately the countervailing public policy concerning the rehabilitation of convicted felons,[2] especially those who have paid their debt to

[1] General Statutes § 17a-3 provides in relevant part: "The department shall plan, create, develop, operate or arrange for, administer and evaluate a comprehensive and integrated state-wide program of services, including preventive services, for children and youth whose behavior does not conform to the law or to acceptable community standards, or who are mentally ill, including deaf and hearing impaired children and youth who are mentally ill, emotionally disturbed, substance abusers, delinquent, abused, neglected or uncared for, including all children and youth who are or may be committed to it by any court, and all children and youth voluntarily admitted to the department for services of any kind. Services shall not be denied to any such child or youth solely because of other complicating or multiple disabilities. . . ."

[2] "The purposes for the enforcement of the criminal laws are the punishment and the rehabilitation of the guilty. . . ." *State* v. *Trantolo,* 209 Conn. 169, 173, 549 A.2d 1074 (1988) (*Healey, J.,* dissenting).

society,[3] against the public policy that the department serves.[4]

Noting that the trial court and this court are bound by the facts found by the arbitrator; *Waterbury* v. *Waterbury Police Union*, 176 Conn. 401, 404, 407 A.2d 1013 (1979);[5] I begin with a review of the facts found by the arbitrator, some of which the majority overlooks. The sequence of events is particularly noteworthy. On January 21, 1994, the residence the grievant shared with another man was searched, and narcotics were found on the premises. The state hired the grievant to be a social services assistant with the department on March 17, 1995. A warrant for the grievant's arrest was issued on April 11, 1995, and served on December 4, 1995. On February 7, 1996, the grievant pleaded guilty to two charges of possession with intent to deliver and received a seven year suspended sentence with three years of probation. The grievant told his employer of his sentence in April, 1996. On July 29, 1996, the state discharged him.

The arbitrator also found that because the grievant was assigned to drive children whose parents may have been drug addicts, the state concluded that it could not retain the services of the grievant in view of his felony conviction of two counts of possession of narcotics

---

[3] The grievant in February, 1996, was given a seven year suspended sentence with three years of probation. The state has not suggested that the grievant did not successfully complete his probation.

[4] Although I dissent from the majority's opinion with respect to whether the arbitrator's award should be vacated, I in no way condone the grievant's criminal behavior.

[5] "Where the submission does not otherwise state, the arbitrators are empowered to decide factual and legal questions and an award cannot be vacated on the grounds that the construction placed upon the facts or the interpretation of the agreement by the arbitrators was erroneous." *Waterbury* v. *Waterbury Police Union*, supra, 176 Conn. 404; see also *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 39, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).

with intent to distribute. The state does have a policy of furloughing employees who report that they have a drug problem, but it was the grievant's conviction of intent to deliver drugs that was of paramount importance to the state. The state ignored a genuinely laudatory letter from the grievant's immediate supervisor covering more than one year of employment. The state's contact with the police and the grievant's probationary officer was superficial. The grievant was willing to submit to drug testing.

In its memorandum of decision, the court stated that the grievant was employed by the state to drive children entrusted to the care or custody of the department, but "[t]he circumstances of such driving, e.g., location, duration, collateral duties, age and numbers of children, time involved, [were] not part of the record." The record also contains no facts as to whether the grievant, himself, abused drugs. It also does not cite rules or regulations of the department relevant to employees convicted of drug offenses.

I

By its ruling, I believe the majority has carried us too far down the road. Under the facts of this case and the conclusion reached by the majority, anyone convicted of a drug offense is prohibited from providing services for the department regardless of that person's duties. As previously discussed, the trial court did not know the circumstances of the grievant's driving of children entrusted to the department. The majority recognizes this limitation in the record at footnote 1 of its opinion. Regardless of this limitation, the majority reaches the conclusion, unsupported by the record, that the grievant supervised those children. See footnote 6 of the majority opinion.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when

although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Sivilla* v. *Philips Medical Systems of North America, Inc.*, 46 Conn. App. 699, 708, 700 A.2d 1179 (1997). The fact of the matter here is that the trial court and this court do not know whether the grievant supervised children or merely transported them from point A to point B while the children were supervised by someone else. We do not know whether the grievant was ever the sole department employee with the children at any particular time.

Furthermore, the majority impermissibly speculates about the grievant's behavior on the basis of commonly held assumptions about and stereotypes of individuals convicted of possession of illegal drugs with intent to distribute. See footnote 3 of the majority opinion. At footnote 6, the majority attempts to distinguish a Superior Court case in which an off-duty school custodian was convicted of possession of cocaine within 1500 feet of a school because a custodian does not supervise schoolchildren. See *Norwalk Board of Education* v. *AFSCME, Council 4, Local 1042, AFL-CIO*, Superior Court, judicial district of Stamford-Norwalk, Docket No. 161740 (March 19, 1998). Here, we do not know whether the grievant supervised children.

I also note significantly that in that case, the Norwalk board of education had specifically articulated a written policy for its employees on the possession and use of drugs on school property or while on school business away from school property. Here, the record does not contain and the department has not referred to any written policy or regulation concerning employee drug use or possession. That fact also distinguishes this case from *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, 252 Conn. 467, 470–71 n.7, 747 A.2d 480 (2000), in which our Supreme Court cited at least ten department level

directives concerning employee conduct and behavior, which the grievant in that case had violated.

## II

Second, I conclude that there is no clear and explicit public policy that prohibits the department from using the grievant's services. The broad brush that the majority uses to depict a public policy to protect and nurture children in this instance is the same one that paints motherhood and apple pie. They are, however, only "general considerations of supposed public interests." *Groton* v. *United Steelworkers of America*, 252 Conn. 508, 520, 747 A.2d 1045 (2000). No one can disagree that taking care of innocent children is a worthy public effort. That public interest is, however, not sufficiently narrow to apply to the circumstances of this case, as we know them.[6]

Despite "the general rule that challenges to an arbitrator's authority are limited to a comparison of the award to the submission, an additional challenge exists under § 52-418 (a) (4) when the award rendered is claimed to be in contravention of public policy." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 474. "Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascer-

---

[6] The majority's statement that "the protection and nurturing of children is an important public policy is almost too obvious for discussion" comes perilously close, in my opinion, to flouting the established rule that "a policy must be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Citation omitted; internal quotation marks omitted.) *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 44, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987).

tained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . . The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail in the present case only if it demonstrates that the board's award clearly violates an established public policy mandate. . . . *Watertown Police Union Local 541* v. *Watertown,* [210 Conn. 333, [340], 555 A.2d 406 (1989)]." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 387, AFL-CIO,* supra, 475.

In part I A of its opinion, the majority acknowledges that under *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.,* 252 Conn. 416, 426, 747 A.2d 1017 (2000), we must determine, as a matter of law, whether the public policy found by the trial court clearly exists. The trial court concluded that "there exists a well-defined and dominant policy prohibiting [the department] from employing persons convicted of felony drug charges of possession with intent to sell, and who are on probation, from driving children who are in the care and custody of [the department]." The majority quotes this conclusion and in its next sentence states, "In essence, we must consider whether providing a safe and nurturing environment for children under the department's care is a clear public policy." I regret that I cannot find a logical path between the trial court's conclusion and the task the majority sets before this court.

The majority cites numerous statutes and some common law in support of its effort to find that providing a safe and nurturing environment is a public policy in this jurisdiction. I concede that this state has a general policy to protect our children, but that general policy is manifested in a variety of specific laws and regula-

tions. The majority traverses some of those legal manifestations to find a specific public policy applicable to the situation at hand,[7] but does not cite one statute or case or regulation that stands for the proposition that, as a matter of public policy, an individual convicted of possession of drugs with an intent to distribute cannot provide transportation for children in the department's care.[8]

I cannot, given the sequence of events here, say that the department has, in fact, a clear, well-defined drug policy with respect to its employees. The grievant's offending conduct occurred in January, 1994. The defendant was employed to provide services within the department in March, 1995. If the department has a clear policy not to hire individuals with a history involving illegal drugs to drive children, what evidence is there that the department screens potential employees for that fact? The defendant was convicted in February, 1996, and he voluntarily informed the department of that fact in April, 1996, when his probation officer advised him to do so. The majority rebukes the grievant for waiting two months to inform the department but overlooks the fact that the department waited almost

---

[7] For example, the majority cites the best interests of the child standard, which is applied in termination of parental rights cases; see, e.g., *In re John G.*, 56 Conn. App. 12, 17, 740 A.2d 496 (1999) ("[i]n the dispositional phase, the trial court determines whether termination is in the best interests of the child"); and in awarding custody in dissolution cases; see, e.g., General Statutes § 46b-56 (b); *G.S.* v. *T.S.*, 23 Conn. App. 509, 514, 582 A.2d 467 (1990) ("[t]he guiding principle applicable to determining the custody of children in a dissolution proceeding is the best interests of the child").

[8] The majority's consideration of the grievant's drug offenses overlooks the complexity of this state's Penal Code to address wrongs of various degrees against our society. The grievant was convicted of violating General Statutes §§ 21a-277 (b) and 21a-278 (b), which relate to possession of marijuana and cocaine with intent to distribute. Most notably for the facts of this case, he was not convicted under General Statutes §§ 21a-278a (possession with intent to distribute to minors) or 21-279 (d) (possession with intent to distribute within 1500 feet of school).

four months to discharge the grievant. It is not at all clear to me that the department had a relevant employment policy, let alone knew of a specific public policy, prior to terminating the grievant.[9]

In its brief, the state relies on the facts in *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 467. That case, however, does not provide the state with solid legal footing. In that case, our Supreme Court stated that "[w]e do not hold that the violation of a criminal statute is a per se public policy violation sufficient to justify vacating an arbitrator's decision. Instead, we conclude that this case poses a narrow, blatant example of the department of correction's proper exercise of its power to dismiss. Although the conduct demonstrated by [the grievant] is particularly offensive to an enlightened society, our decision here is dictated not by personal standards of decency, but by proper legal precedent that does provide, in this case, the just outcome." Id., 477–78.[10]

For these reasons, I conclude that a clear public policy prohibiting the department from employing a person convicted of a felony drug charge did not exist when the grievant was discharged.

### III

I need not spend much time on the last of my reasons for dissenting from the majority's opinion. I dissent, in part, because the countervailing public policy concerning the rehabilitation of criminals was not given the lengthy and detailed analysis it needs under the circum-

---

[9] The majority also relies on the regulations applicable to school bus drivers; see footnote 5 of the majority opinion; without any evidence that the regulations apply to department drivers.

[10] In *State* v. *AFSCME, Council 4, Local 387, AFL-CIO*, supra, 252 Conn. 467, the terminated employee violated several laws and department of correction directives while he was on the job. The concurring opinion notes that distinction. Id., 479 (*Peters, J.*, concurring).

stances of this case.[11] Our legislature has enacted a law declaring that society is best protected when criminals are rehabilitated and returned to society. Employers are encouraged to consider favorably qualified individuals, including those with a criminal past. See General Statutes § 46a-79.[12] " '[R]etribution is no longer the dominant objective of the criminal law' and . . . '[r]eformation and rehabilitation of offenders have become important goals of criminal jurisprudence.' *Williams* v. *New York*, 337 U.S. 241, 248, 69 S. Ct. 1079, 93 L. Ed. 1337, reh. denied, 337 U.S. 961, 69 S. Ct. 1529, 93 L. Ed. 1760 (1949)." *State* v. *Corchado*, 200 Conn. 453, 463, 512 A.2d 183 (1986); see also *State* v. *Wilson*, 242 Conn. 605, 641, 700 A.2d 633 (1997) (*Katz, J.*, concurring) (three asserted purposes of criminal law are rehabilitation, deterrence, retribution); *State* v. *McDowell*, 242 Conn. 648, 653, 699 A.2d 987 (1997) ("probation seeks 'to normalize the probationer into society as soon as reasonably possible"); *State* v. *Guckian*, 226 Conn. 191, 200, 627 A.2d 407 (1993) (legislature sought to provide drug rehabilitation system for people coming into criminal justice system); *State* v. *Groos*, 110 Conn. 403, 412, 148 A. 350 (1930) (board of parole has power to modulate punishment to bring about protection of society and rehabilitation of offender). I believe that

---

[11] The majority lightly dismisses this important public policy by merely citing a dissenting opinion in a case decided by our Supreme Court and ascribing the word severe to the nature of the grievant's crimes. Nowhere in its opinion does the majority cite any law distinguishing crimes that are severe from those that are not severe. Indeed, if the grievant's crimes were so offensive to the children of our society, a suspended sentence and only three years of probation does not support that notion.

[12] General Statutes § 46a-79 provides: "The General Assembly finds that the public is best protected when criminal offenders are rehabilitated and returned to society prepared to take their places as productive citizens and that the ability of returned offenders to find meaningful employment is directly related to their normal functioning in the community. It is therefore the policy of this state to encourage all employers to give favorable consideration to providing jobs to qualified individuals, including those who may have criminal conviction records."

this court has an obligation to balance thoroughly competing public policies when determining whether an arbitration award so violates a specific public policy to warrant our vacating the award pursuant to § 52-418 (a) (4).

For these reasons, I respectfully dissent.