## CITY OF HARTFORD *v.* AFSCME, COUNCIL 4, LOCAL 1716, ET AL.

Superior Court, Judicial District of Hartford
File No. CV-08-4041655-S

Memorandum filed January 5, 2010

*Corporation counsel of the city of Hartford,* for the plaintiff.

*J. William Gagne, Jr.,* for the named defendant.

*Richard ·S. Cramer,* for the defendant Robert McCloud.

HON. JOHN J. LANGENBACH, JUDGE TRIAL REFEREE. This application to vacate an arbitration award arises out of the termination of the defendant Robert McCloud, a member of the named defendant, AFSCME, Council 4, Local 1716 (union),[1] from his position of employment as a building inspector with the city of Hartford (city). The arbitration panel found the following facts. McCloud began working for the city in 1988. In February of 2006, McCloud was indicted by a federal grand jury on numerous counts of possession of child pornography. The indictment alleged that McCloud would travel to beaches to film young girls, between

---

[1] For purposes of this memorandum, McCloud and the union will collectively be referred to as the defendants.

the ages of four and twelve, in their bathing suits. The films were made without their knowledge and without the consent of their parents. He would use the zoom function in his video camera to focus on the girls' buttocks and genital areas. While filming, he also recorded his own overtly sexual comments describing what he would like to do to the girls. The films were made sometime during the 1990s. There was no evidence that McCloud ever approached the girls that he filmed.

The arbitration panel further found that in February of 2006, after the indictment was brought to the city's attention, McCloud was placed on administrative leave. During that time, the city began to review McCloud's employment record. On his application for employment, McCloud admitted to having been convicted of obscenity violations in February of 1979, for which he was incarcerated. During its investigation, the city was able to obtain McCloud's arrest record. The record revealed that McCloud had been convicted of incest, risk of injury to a child and sexual assault.

The arbitration panel also found that on August 13, 2007, the city conducted a disciplinary hearing regarding the federal charges pending against McCloud. At the disciplinary hearing, McCloud did not deny making the video or recording the sexually explicit comments. Based on the evidence presented at the hearing, McCloud was notified by letter dated August 22, 2007, of his termination effective August 24, 2007. The letter explained that McCloud's conduct, as described in the indictment, "reflects unfavorably on the [city] and seriously erodes the trust that taxpayers place in city employees, thereby rendering [him] ineffective as a building inspector." Although the city had knowledge of McCloud's past criminal history while he was on administrative leave, the letter of termination failed to

mention his prior convictions (or his alleged falsification of his employment application) as a basis for discharge.

Pursuant to a collective bargaining agreement, the union filed for arbitration with the state board of mediation and arbitration. The evidentiary hearing concluded on January 10, 2008. On September 29, 2008, before the arbitration panel had issued its decision, United States District Court Judge Alvin W. Thompson rendered a judgment of acquittal on all federal charges pending against McCloud. The arbitration panel agreed to admit the disposition of the federal charges into the record over the city's objection. Thereafter, on December 3, 2008, the arbitration panel issued a written award reinstating McCloud to his position with full back pay.

In the award, the arbitration panel concluded that the city lacked just cause to terminate McCloud. In particular, the arbitration panel found that any evidence that McCloud's conduct underlying the indictment had an injurious effect on the city was merely speculative. According to the award, the city failed to establish a nexus between McCloud's conduct and his employment responsibilities sufficient to support a finding that McCloud's actions had a significant impact on the city's business interests. The arbitration panel also rejected the city's claim that it had just cause to terminate McCloud because he lied on his 1989 employment application by failing to list his 1979 convictions. The award explained that McCloud had listed prior convictions for obscenity violations and indicated his incarceration. Furthermore, the award stated that even if the arbitration panel were to conclude that McCloud lied on his application, it would not consider such evidence because the city was aware of McCloud's prior convictions while he was on administrative leave, yet failed to mention the alleged falsification as a basis for his discharge. As such, the arbitration panel excluded any

evidence regarding the alleged falsification by virtue of the general rule that "an employer may not present any evidence of alleged offenses as a justification for discharge which were not specified as a reason at the time of discharge."

On December 31, 2008, the city filed an application to vacate the award pursuant to General Statutes § 52-418.[2] The city then filed a memorandum in support of its application on June 15, 2009. On September 3, 2009, the defendants filed a memorandum in opposition to the city's application. A hearing on the matter was held on September 24, 2009. On November 5, 2009, the defendants filed a supplemental brief in opposition to the application. The defendants then filed an application to confirm the award pursuant to General Statutes § 52-417[3] on November 20, 2009.

The city argues the award should be vacated because it violates public policy.[4] According to the city,

---

[2] General Statutes § 52-418 (a) provides in relevant part: "Upon the application of any party to an arbitration, the superior court for the judicial district in which one of the parties resides or . . . when the court is not in session, any judge thereof, shall make an order vacating the award if it finds any of the following defects: (1) If the award has been procured by corruption, fraud, or undue means; (2) if there has been evident partiality or corruption on the part of any arbitrator; (3) if the arbitrators have been guilty of misconduct in refusing to postpone the hearing upon sufficient cause shown or in refusing to hear evidence pertinent and material to the controversy or of any other action by which the rights of any party have been prejudiced; or (4) if the arbitrators have exceeded their powers or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made."

[3] General Statutes § 52-417 provides in relevant part: "At any time within one year after an award has been rendered and the parties to the arbitration notified thereof, any party to the arbitration may make application to the superior court for the judicial district in which one of the parties resides or . . . when the court is not in session, to any judge thereof, for an order confirming the award. The court or judge shall grant such an order confirming the award unless the award is vacated, modified or corrected as prescribed in sections 52-418 and 52-419."

[4] Although the city claims that its application to vacate the award is pursuant to General Statutes § 52-418, vacation of an award on the basis of public policy is actually a separate exception to the general rule of judicial

McCloud's reinstatement violates the state's clear public policy in favor of protecting children because his position as a building inspector provides him with access to locations where there are young children, including schools, residential houses, and day care facilities. Furthermore, because building inspectors work independently and are not directly supervised, McCloud's reinstatement violates the state's public policy in favor of closely supervising individuals who have committed sexual offenses.[5]

In opposition, the defendants argue the award should not be vacated because the award conforms to the unrestricted submission of the parties. The defendants maintain that the city has not satisfied its burden of proving the award violates public policy because it has failed to identify any explicit, well-defined, dominant public policy implicated by the award. The defendants further argue that even if the city can identify a public policy, the city has not met its burden of establishing that the award violates public policy in light of the facts of this particular case.

I

STANDARD OF REVIEW

"The standard of review relative to arbitration awards depends on the nature of the challenge. With a volun-

deference to an arbitration award rendered pursuant to a voluntary submission. See *Brantley* v. *New Haven*, 100 Conn. App. 853, 860 and n.11, 920 A.2d 331 (2007).

[5] In its application to vacate, the city also argued that the award should be vacated on the grounds that: (1) the arbitration panel relied on evidence not properly before it; (2) the award was not issued in compliance with the General Statutes and/or the Regulations of Connecticut State Agencies; (3) the award was untimely in violation of General Statutes § 52-416; and (4) the arbitrators exceeded their powers because the award manifests an egregious and/or patently irrational application of the law. Nevertheless, because the city failed to brief these grounds in its memorandum in support of its application to vacate the award, any arguments relating thereto are considered abandoned. See *Connecticut Light & Power Co.* v. *Dept. of Public Utility Control*, 266 Conn. 108, 120, 830 A.2d 1121 (2003).

tary, unrestricted submission to an arbitrator . . . the court may only examine the submission and the award to determine whether the award conforms to the submission. . . . In making such a comparison when the submission is unrestricted, the court will not review the evidence or legal questions involved, but is bound by the arbitrator's legal and factual determinations." (Internal quotation marks omitted.) *Enfield* v. *AFSCME, Council 4, Local 1029,* 100 Conn. App. 470, 473–74, 918 A.2d 934, cert. denied, 282 Conn. 924, 925 A.2d 1105 (2007).

Nevertheless, "[c]ertain conditions do exist . . . under which [the court is to] conduct a more searching review of arbitral awards." (Internal quotation marks omitted.) Id., 474. The three grounds for vacating an award when the submission is unrestricted have been articulated by our Supreme Court. See *Garrity* v. *McCaskey,* 223 Conn. 1, 6, 612 A.2d 742 (1992). "These grounds arise when the award (1) rules on the constitutionality of a statute, (2) violates clear public policy or (3) contravenes one or more of the statutory proscriptions of General Statutes § 52-418." (Internal quotation marks omitted.) *Enfield* v. *AFSCME, Council 4, Local 1029,* supra, 100 Conn. App. 474.

When a party raises the issue of a public policy violation with regard to an arbitral award, a two step process is required. "First, [the court must] determine whether an explicit, well-defined and dominant public policy can be identified." (Internal quotation marks omitted.) *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.,* 273 Conn. 634, 656, 872 A.2d 423, cert. denied sub nom. *Vertrue, Inc.* v. *MedValUSA Health Programs, Inc.,* 546 U.S. 960, 126 S. Ct. 479, 163 L. Ed. 2d 363 (2005). Second, if a clear public policy can be identified, the court must then address the ultimate question of whether the award itself violates that policy. Id. When analyzing the second step, the court conducts a de novo

review of the award. See *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, 89 Conn. App. 680, 683, 874 A.2d 839, cert. denied, 275 Conn. 912, 882 A.2d 673 (2005). Nevertheless, "[e]ven in the context of de novo review, [the court] defer[s] to the arbitrators' factual determinations." *Brantley* v. *New Haven*, 100 Conn. App. 853, 861, 920 A.2d 331 (2007).

## II

## PUBLIC POLICY IDENTIFICATION

The first issue is whether a clear public policy is implicated in this case. "A challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them." (Internal quotation marks omitted.) *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, supra, 89 Conn. App. 683–84. Under these circumstances, "the court is not concerned with the correctness of the arbitrator's decision, but with the lawfulness of enforcing the award." (Internal quotation marks omitted.) Id., 684.

"Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests." (Internal quotation marks omitted.) *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 798, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000). "Our view that public policy exceptions to arbitral authority

should be narrowly construed finds support in . . . *United Paperworkers International Union, AFL-CIO* v. *Misco, Inc.*, 484 U.S. 29, 44, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987), [where] the United States Supreme Court concluded that a policy against the operation of dangerous machinery by persons under the influence of drugs or alcohol, while firmly rooted in common sense, did not permit a court to set aside an arbitration award. *New Haven* v. *AFSCME, Council 15, Local 530*, 208 Conn. 411, 417, 544 A.2d 186 (1988). Therefore, the award must be clearly illegal or clearly violative of a strong public policy. . . . Furthermore, [t]he party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated." (Citation omitted; internal quotation marks omitted.) *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, supra, 273 Conn. 655–56.

In determining whether an arbitral award violates a well-defined public policy, the courts of our states have looked to "statutes, administrative decisions and case law." Id., 657. "Rather than requiring that public policy be grounded on a particular type of source, however, in determining whether a party has satisfied its burden of demonstrating the existence of a well-defined public policy, [courts] have instead focused [their] inquiry on whether the alleged public policy is in fact clearly discernible in the purported source." Id., 657–58.

The city claims that the award conflicts with two public policies of the state, which are each considered, in turn.

A

The Protection of Children

The first public policy that the city claims is contravened by the award is the state's public policy in favor

of protecting children. As support for this policy's presence in our jurisprudence, the city relies exclusively on *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO,* supra, 59 Conn. App. 799, in which our Appellate Court recognized the state's clear public policy in favor of "[t]he protection of children from harm . . . ."

In *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO,* supra, 59 Conn. App. 798, the Appellate Court was asked to "consider whether providing a safe and nurturing environment for children under the [care of the department of children and families (department) was] a clear public policy." In answering the question in the affirmative, the court explained that "ample sources exist that clearly show that the protection of children, *particularly those in the department's care,* is a clear, well-defined, dominant and compelling public policy of this state." (Emphasis in original.) Id. The court referenced various statutes and cases that emphasized the importance of protecting children in the context of custodial disputes. See id., 798–99, citing General Statutes §§ 17a-101 (a) and 45a-706. In concluding its discussion on whether a clear public policy was implicated, the court stated: "[W]e conclude that the protection of children, *with specific reference to the department,* is a clear public policy of this state." (Emphasis in original.) *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO,* supra, 799.

Although this court acknowledges that the protection of children is a clear public policy of the department, it does not read *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO,* supra, 59 Conn. App. 799, so broadly as to necessarily implicate an explicit, well-defined and dominant public policy in favor of the protection of children in every context. Although the Appellate Court recognized the clear public policy in favor of the protection of children, the court was careful to qualify its

statements by making specific references to the department. See id. Additionally, the department provided statutory support for its reliance on this broad public policy. See id. ("[t]he department has statutorily based obligations to maintain and support children under its care that must be followed"). Thus, in comporting with the narrow construction given to public policies, the broad statements relied upon by the city to establish a public policy in favor of the protection of children are limited to situations where, as with the department, an explicit public policy can be ascertained by reference to laws and legal precedents. See id., 798; cf. *State* v. *New England Health Care Employees Union, District 1199, AFL-CIO*, 265 Conn. 771, 785 n.20, 785–86, 830 A.2d 729 (2003) (acknowledging that "the plaintiff, acting through the department, ha[d] a broad public policy regarding the protection of the children of our state," but nonetheless requiring specific statutory authorization for specific public policy to clinically evaluate and assist residents at school).

The city has not cited any authority that would support an explicit public policy in favor of the protection of children without specific reference to the department. Instead, the city's reliance on *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 798, and its references to the broad public policy statements regarding the importance of the protection of children therein, without any other support, merely implicate general considerations of supposed public interests, which provide an insufficient basis for the court to vacate an award. Because it has not identified any source for the proposition that the protection of children is a public policy implicated with respect to building inspectors, the city has not met its burden of establishing an explicit, well-defined and dominant public policy with respect to the protection of children. Because the city has failed to satisfy its initial burden,

the court need not address the city's arguments regarding whether the award itself violates public policy.[6]

## B

### Supervision of Sexual Offenders

According to the city, the second public policy implicated by the award is the state's public policy in favor of "the close supervision of individuals who have committed sexual offenses." In support of its claim, the city relies on General Statutes § 54-250 et seq., commonly referred to as Megan's Law, for the proposition that supervision of sexual offenders is an explicit, well-defined and dominant public policy that "allow[s] the state and general public to keep track of the whereabouts of these convicted felons."

As recognized by our Supreme Court, "the statute relied upon as a ground for the alleged public policy [may be] too tenuously related to the subject matter to

---

[6] Nevertheless, the court notes that even if it were to decide that the city has clearly identified a public policy in favor of the protection of children, the city has not met its burden of clearly establishing that the award itself clearly violates that public policy. In particular, as stated in the arbitration award, "[a]lthough the city suggested that building inspectors routinely go into buildings where children are present, e.g., a new high school or day care center, other than speculative comments by its two witnesses, there was no evidence. Specifically, [the city] did not present any records that indicated that [McCloud] would have been in contact with school age children during the course of his daily routine. In fact, the city admitted that records are available that would show the number of buildings that are abandoned, occupied or partially renovated at the time that inspections are made but failed to present that evidence at this hearing. There are also records available that would show the type of facility that was being inspected, e.g., school, day care center, home. These records were also not presented to this panel." (Emphasis added.) Thus, even if this court were to interpret the broad language of *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 59 Conn. App. 798, to provide an explicit public policy, the city's failure to present evidence to establish the illegality of the award would prove fatal to its case. This case is thus distinguishable on its facts from *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, supra, 804 n.6, where it was undisputed that the grievant had contact with children.

constitute a ground for a clearly defined and dominant public policy. For example, in *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, [257 Conn. 80, 81–82, 777 A.2d 169 (2001), the Supreme Court] concluded that the state did not meet its burden of proving that an arbitration award that granted overtime pay to staff attorneys for the commission on human rights and opportunities violated what the state claimed was a clear public policy of prohibiting professional employees from receiving overtime compensation. In arguing for the existence of the public policy, the state pointed to the Federal Fair Labor Standards Act, 29 U.S.C. § 213 (a) (1), and the related state statute, General Statutes § 5-245 (b). . . . [The Supreme Court] concluded that the purpose of those statutes is violated when workers are paid less than the amount set forth therein, and that employers do not violate the purpose of the statutes by providing employees with greater benefits than those required. . . . In another case, *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, [255 Conn. 800, 802, 770 A.2d 14 (2001), the Supreme Court] reversed the Appellate Court's judgment vacating an arbitral award and disagreed that the award, which ordered the plaintiff town to reinstate a union member to his position as a police officer for the town, violated the specific public policy of a town's control over the fitness for duty of its police force . . . . [The Supreme Court] concluded that General Statutes §§ 7-274, 7-276 and 7-294d (a) (10), or § 7-294e-16 (j) of the Regulations of Connecticut State Agencies, all of which establish a town's authority to establish a board of police commissioners and set entry level requirements for town officers, provided a sufficient basis to establish the purported public policy. . . . In analyzing the various statutes and regulations, [the Supreme Court] concluded that they did not establish an explicit public policy that a town has control over termination for

fitness for duty of a police officer such as [the officer who had been terminated]." (Citations omitted; internal quotation marks omitted.) *MedValUSA Health Programs, Inc.* v. *MemberWorks, Inc.*, supra, 273 Conn. 660–61.

Like the applicants in both *State* v. *AFSCME, AFL-CIO, Council 4, Local 2663*, supra, 257 Conn. 81–82, and *South Windsor* v. *South Windsor Police Union Local 1480, Council 15*, supra, 255 Conn. 802, the city has not satisfied its burden of establishing that the arbitration award reinstating an individual who was acquitted on child pornography charges violates what the city claims is an explicit public policy in favor of closely supervising individuals who have committed sexual offenses. Megan's Law is too tenuously related to the subject matter to constitute a ground for a clearly defined and dominant public policy. Simply put, the public policy announced in Megan's Law is much narrower than the policy suggested by the city because Megan's Law only imposes a registration requirement on those individuals who are convicted or found not guilty by reason of mental disease or defect. Megan's Law does not provide broad authority for employers to track and monitor the every move of an employee, who has been acquitted of child pornography crimes, while he is at work.

The purpose of Megan's Law is to alert the public, though the registration requirement, of potential sexual offender recidivists when necessary for public safety. See *State* v. *Boysaw*, 99 Conn. App. 358, 363, 913 A.2d 1112 (2007). This purpose is violated when individuals subject to the registration requirement neglect to register. Megan's Law, however, only explicitly subjects certain individuals to the registration requirement. In particular, "[a]ny person who has been *convicted or found not guilty by reason of mental disease or defect*" of an offense therein is required to register. (Emphasis

added.) General Statutes §§ 54-251 (a), 54-252 (a) and 54-254 (a). Thus, the purpose of Megan's Law is only violated when a person, who has been convicted or found not guilty by reason of mental disease or defect of an offense listed therein, declines to register. The purpose is not violated, therefore, when an individual who has been acquitted of an enumerated offense neglects to register because he was never subject to the registration requirement in the first place. Megan's Law, therefore, does not establish an explicit public policy in favor of the registration or monitoring of an acquitted individual. Because McCloud was acquitted of all charges pending against him in 2006, he was never subject to the registration requirement of Megan's Law, and its public policy is not implicated.

To the extent that the city's public policy argument is based on McCloud's 1979 convictions, the city similarly has not met its burden of establishing an explicit, well-defined and dominant public policy grounded in Megan's Law. Megan's Law imposes a registration requirement on certain individuals who have been convicted or found not guilty by reason of mental disease or defect of an offense therein. See General Statutes §§ 54-251 (a), 54-252 (a) and 54-254 (a). The arbitration award in the present case does not implicate Megan's Law because McCloud is not subject to the registration requirements by virtue of his 1979 conviction.[7] Furthermore, even if the court were to assume that the policy behind Megan's Law is implicated, reinstating McCloud does not violate the public policy stated therein. That is, the arbitration award issued in this case does not forbid or fly in the face of compliance with the registration requirement of Megan's Law. It is possible for a

[7] Megan's Law, which came into effect in 1998, does not apply retroactively. See *State* v. *Boysaw*, supra, 99 Conn. App. 363–64. Accordingly, because McCloud was convicted in 1979, before the legislature enacted any registration legislation, he is not subject to Megan's Law.

convicted sexual offender to register in accordance with Megan's Law and still maintain employment. Such a scenario would align with the public policy of Megan's Law by alerting the public of the offender's whereabouts while still comporting with the arbitration award of reinstatement. The city, therefore, has failed to establish that the public policy of Megan's Law is violated by the award, especially in light of our clear, well-defined public policies favoring the employment of rehabilitated, convicted criminal offenders pursuant to General Statutes § 46a-79,[8] and arbitration as a means of settling disputes.

In short, while the conduct underlying McCloud's termination was, as articulated by the arbitration panel, "inappropriate at best," the city cannot terminate McCloud for engaging in conduct that it finds disturbing. In light of the narrow construction of this particular exception of judicial deference to arbitral authority, the city must point to a clearly defined public policy in order to vacate an award on that basis, and it simply has not met its burden.

## III

## CONCLUSION

For the foregoing reasons, this court declines to vacate the arbitration award, and the city's motion is denied.

---

[8] General Statutes § 46a-79 provides: "The General Assembly finds that the public is best protected when criminal offenders are rehabilitated and returned to society prepared to take their places as productive citizens and that the ability of returned offenders to find meaningful employment is directly related to their normal functioning in the community. It is therefore the policy of this state to encourage all employers to give favorable consideration to providing jobs to qualified individuals, including those who may have criminal conviction records."