## CITY OF ANSONIA v. EARL STANLEY

Superior Court, Judicial District of Ansonia-Milford
File No. CV-03 0083909S

Memorandum filed May 12, 2004

*Winnick, Vine, Welch & Teddosso,* for the plaintiff.

*Harlow, Adams & Friedman,* for the defendant.

CREMINS, J. Before the court is the plaintiff's application to vacate the arbitration award pursuant to General Statutes § 52-418 and the defendant's cross application to confirm the arbitration award.

The plaintiff, the city of Ansonia (city), and the Connecticut Independent Police Union, Local No. 13, are parties to a written collective bargaining agreement (agreement) dated July 1, 2000, to June 30, 2003. That agreement includes a grievance procedure for the resolution of disputes. On August 5 and 6, 2002, the city's board of police commissioners (board) held a disciplinary hearing for the defendant, Officer Earl Stanley, relating to an internal affairs investigation conducted by the city's police department (department). The board heard argument, evidence and testimony and concluded that it had just cause to terminate Stanley's employment. Although only four of five commissioners were present, their vote was unanimous. The termination was predicated on Stanley's alleged violation of eight sections of the city's police department duty manual entitled: "Rules and Regulations of the Ansonia Police Department."[1]

---

[1] The sections of the duty manual are as follows: "Section 2 Standards of Conduct–Standards of conduct shall apply to members of the Department. Members of the Department shall be deemed to be those persons who have been sworn for duty. Employees of the Department shall be deemed to be those persons who are unsworn and who have been engaged to perform specific duties for the Department.

"Section 2.1–In addition to the specific duties of each individual rank and assignment, as set forth in Section Three of this Manual, all sworn members of the Department shall . . .

"2.1.6 Truthfulness–Speak the truth at all times and under all circumstances. In cases in which he is not allowed by the regulations of the Department to divulge facts within his knowledge, he will decline to speak on the subject. . . .

"2.1.10 Respect–extend the proper courtesy and respect toward all members of the Department and others at all times.

"2.1.11 Civility–be civil, orderly, diligent, discreet, courteous and patient as a reasonable person is expected to be in all situations and shall not engage in any altercation, physical or otherwise whether on duty or not, with any other member or employee of the Department. . . .

Pursuant to step three of the grievance procedure, the parties jointly submitted the grievance to the state board of mediation and arbitration. On December 19, 2002, an arbitration hearing was held before a tripartite panel (panel) regarding Stanley's termination of employment. At the hearing, the city and the defendant were unable to frame a joint submission to the panel. At the request of the panel, the parties provided argument on what the submission should be. Upon review, the panel voted to frame the issue in the manner proposed by the city. The submission was unrestricted. The panel framed the issue for consideration as follows: "Whether the Respondent City of Ansonia Board of

"2.1.13 Oath of Office, Code of Ethics–carry out their oath of office and the code of police ethics to the best of the member's ability. . . .

"Section 2.3 Prohibited Conduct–The following acts by a member of the Department are prohibited or restricted. . . .

"2.3.2 Conduct Unbecoming of An Officer–conducting himself in a way which reflects discredit upon the member as a police officer, or upon his fellow officers or the Police Department, or which tends to indicate that the officer is unable or unfit to continue as a member of the Police Department, or tends to impair the operation of the Police Department or its officers.

"2.3.3 Neglect of Duty–conducting or omitting the performance of one's duty such that performance is not in accordance with the established and ordinary duties or procedures, or which constitutes use of unreasonable judgment in the exercising of any discretion granted to a police officer. . . .

"2.3.22 Duty Time Limited To Police Work–conducting personal business while on duty or devoting any of his 'on duty' time to any activity other than that which relates to police work or performing any police duty in uniform for the purpose of private gain, unless properly authorized. . . .

"Section 4 Disciplinary Charges, Hearings and Procedures. . . .

"4.4.3 Offense and Violations–departmental offenses and violations include but are not limited to the following . . . D. Neglect of Duty or Disobedience of orders—police officers while on duty shall devote their time and energies to the duties and responsibilities of rank, grade, or position to which they are assigned. In carrying out those duties, officers shall direct and coordinate their efforts in such a manner as will tend to establish and maintain the highest standard of efficiency. Any conduct or omission which is not in accordance with one's established and ordinary duties and procedures, or which constitutes use of unreasonable judgment in the exercise of the discretion granted to an individual officer, shall be considered neglect of duty."

Police Commissioners had just cause to terminate the employment of the Grievant Officer Earl Stanley; and if not, what should the remedy be?"

On March 19 and April 11, 2003, the panel held hearings and received evidence, argument and testimony regarding the merits of Stanley's grievance. On November 18, 2003, the panel issued a written arbitration award (award), finding that the city had violated Stanley's procedural rights under article 14, § G, of the agreement,[2] and ordered Stanley reinstated, but without back pay.

The panel made the following findings. During the hearing of August 6, 2002, many issues came to the attention of the board. The first issue was sexual misconduct. The complainant, S, was present at the August 6, 2002 hearing, and the panel found that her testimony was credible and that the testimony was not rebutted by Stanley, who elected not to testify.

The complaint made by S resulted in a criminal investigation by the state police. During this investigation, the state police received a statement from another complainant, B, who alleged she had been subjected to lewd, obscene and sexually harassing conduct from Stanley.

---

[2] Article 14, § G provides: "Whenever a nondepartmental complaint is made against an employee or group of employees, such complaint shall be submitted in writing under oath. If such complaint relates to the conduct of said employee(s) as police officer(s) or the manner in which said employee(s) discharged police duties, and the police officer was acting reasonab[ly] and lawfully in the course of his or her employment when engaging in the conduct which is the subject of the complaint, and no charges are brought against the employee(s) of the City, [and] said complaint results in court action, said employee(s) shall be entitled to be represented by the City's attorney, or, at the City's option, another attorney of the City's choice, whose fees shall be paid for by the City. Any employee, against whom a written complaint has been filed, must be provided a copy of such complaint within seven (7) days of its being filed. Such complaint shall be dismissed if not acted on by the Board of Police Commissioners within five (5) months of the date of the complaint being filed."

Some of the conduct in this second complaint was alleged to have taken place while Stanley was on duty. Both S and B claimed in their statements to be afraid of Stanley and feared that he would hurt them. They both alleged that Stanley's advances were resisted and rejected. The panel concluded that the complaint by S was the main reason why the state police brought criminal charges against Stanley. The panel found that the complaint by B had corroborative value and was very significant.

The charges by the state police also prompted the department to begin an internal investigation against Stanley. It was clear, however, that Stanley did not receive a copy of the second complaint by B until about May 6, 2002.

On April 6, 2001, Stanley was arrested and charged with sexual assault in the fourth degree. On August 30, 2001, a third complaint by M surfaced. Like the complaint by B, the third complaint by M alleged incidents of sexual harassment by Stanley while on duty.

Stanley's case came before the Superior Court on December 14, 2001, at which time he applied for accelerated rehabilitation after undergoing a "psychosexual evaluation and risk assessment." At the court hearing on December 14, 2001, Stanley admitted to "having sexually charged conversations with [S] and her friend," and to touching S, and seemed "to recognize that [the conversations were] inappropriate." During the court appearance, Stanley's attorney indicated that his client recognized that "whatever behavior he engaged in that day [with S] wasn't appropriate." He also indicated that the incident was a learning experience that taught Stanley "something about boundaries and appropriate behavior." Stanley did not address the court. In granting the accelerated rehabilitation, the court noted that the victim, S, did not object and that "this was not an on

duty misuse of authority." The court did find, however, that Stanley's conduct was "sufficient to warrant an arrest," and that the age difference between the victim and Stanley made the conduct that occurred "inappropriate."

While the court did not make a determination of guilt, it did not exonerate Stanley, either. As a result of the proceedings, Stanley was placed on two years probation and admonished not to have contact with S. The court ordered Stanley to continue counseling, make restitution to S for lost wages, pay up to $1000 for her counseling and to perform 100 hours of community service. The court's determination on Stanley's application for accelerated rehabilitation did not involve consideration of the on duty conduct alleged in the complaints by B and M.

During the spring of 2002, after the criminal charges had been disposed of, the internal affairs investigation intensified. As a result, Stanley was questioned on May 6, 2002, and was advised as to the identity of the women who had accused him and as to the nature of the complaints. He was told of the alleged "unsolicited sexual vulgarity and sexual contact" and the "inappropriate use of a police cruiser and lights." According to Lieutenant Michael Abbels, the interrogator, Stanley denied the allegations made by the complainants. Abbels also stated that, in his opinion, Stanley "intentionally lied to him" and "tried to mislead him."

To buttress his conclusion, Abbels pointed out that Stanley "denied trying to have a relationship with the individuals [who] had filed the first and second complaints," but "finally admitted that he was trying to have a sexual relationship with them." Abbels also pointed out that Stanley denied shining or flashing his lights at females while in his patrol car. Abbels indicated,

however, that Officer Tirella, who had been in Stanley's patrol car "many times," indicated to Abbels that Stanley did so on many occasions while Tirella was present. Based on the aforementioned circumstances, Abbels concluded that he needed to conduct another meeting with Stanley to clear the "many inconsistencies." The scheduled meeting was held on June 14, 2002.

On July 10, 2002, the department received a fourth statement relating to conduct by Stanley that had occurred two years prior. In this statement, the complainant, K, discussed "being flagged down by Officer Stanley." According to her statement, on one occasion, Stanley encountered K, told her she "looked nice" and told her, "why don't you pull up your shirt . . . ." On July 20, Abbel presented his internal affairs investigation report. On July 23, Stanley was given a copy of the report together with notice that the report was being presented to the board on July 30. Stanley was informed that on July 30, the board would "convene a hearing to consider whether any disciplinary action should be taken against [him]." That hearing was postponed and reconvened on August 6, 2002.

At the August 6 hearing, the board "heard evidence and testimony from witnesses presented by Chief Hale of the Department and also on behalf of Officer Stanley." The board also received evidence concerning relevant charter provisions and the agreement. The board found that the "evidence of the witnesses called by the Police Department held greater weight." The board also found that the violations of §§ 2.1.3, 2.1.6, 2.1.10, 2.1.11, 4.4.3, 2.3.3 and 2.3.22 of the department's duty manual were substantiated. Based on this conclusion, the board "decided to terminate the services of Earl Stanley with immediate effect as of August 6, 2002." A motion subsequently was made and unanimously approved.

Based on the information presented, the panel made the following conclusions.[3] The panel sustained Stanley's grievance and concluded that the city had violated Stanley's rights under article 14, § G, of the agreement and, therefore, the city did not have "just cause" to

[3] The panel considered the following arguments of both parties. The city's position to the panel was that the conduct engaged in by Stanley was egregious and unbecoming of a police officer. The city argued that the conduct violated multiple departmental rules and regulations and gave the board just cause to terminate Stanley's employment. The city argued that the conduct was corroborated by uncontradicted testimony from the victims at the August 6 hearing. Additionally, the city noted that Stanley was never exonerated of the charges brought by the state with regard to the first complaint and that the granting of accelerated rehabilitation did not involve the consideration of the allegations of on duty misconduct made by the other complainants. Of the statements and testimony provided, the city stated that "the nature of their complaints, although not fully uniform, was consistent." According to the city, the testimony "detailed the use of unsolicited vulgar and sexually explicit language, unsolicited sexual contact and/or improper use at night of the [Ansonia police department] cruiser and spotlights."

The city also argued that Stanley "denied many of the victims' allegations, but then conditionally admitted to their validity" and generally was not truthful during the department's investigation of the complaints against him. The city noted that his actions "violated a societal network of relationships of trust, which must be in place in order for him to be an effective and respected officer." The city argued that Stanley also abused the considerable clout and authority that is concomitant with his duties, as well as his responsibility to use department resources and equipment solely for official department business.

The city further contended that it did not violate Stanley's rights under the agreement. First, the city indicated that it was not required to give Stanley a copy of the first complaint because of the ongoing criminal investigation by the state. Second, the city indicated that it was not required to give Stanley a copy of the second complaint because it was made during the pendency of the criminal investigation and was not made to the city. Last, the city argued that it did not have an obligation under the agreement to give Stanley a copy of the third complaint, or the two year old statement, because they were obtained during the pendency of the internal affairs investigation. Furthermore, neither of the last two situations was covered by the article 14, § G, language of the agreement.

According to the city, the board acted within the procedural parameters established in the agreement, the only "controlling document." The city also argued that the procedural requirements relied upon by Stanley were inapplicable. The city further indicated that the five month limitation in

discharge Stanley. This conclusion was "based on the fact that the [agreement did] not expressly exclude the complaints, statements or allegations used as a basis for his termination from the five month limitation period in that section of the [agreement]." The panel found that "Article 14 [did] not expressly create an exception for these types of complaints insofar as the disclosure requirements contained therein. Neither [did] it create an exemption for complaints or allegations that arise during the pendency of an internal affairs investigation as claimed. The language in both cases refer[red] to 'a written complaint' without further qualification."

The panel further concluded that the city violated the agreement's procedural requirements because it did not provide Stanley with copies of the complaints by B and M within seven days of receiving them. "By the terms of the agreement, the city could not use [these] complaints as a basis for terminating [Stanley because]

article 14, § G, of the agreement did not apply under the previously described circumstances for the very same reasons. The city categorically denied that Stanley was deprived of his right to a closed hearing and contended that the vote of the board was indeed unanimous, as required by the city charter. Finally, the city argued that the unanimity of the vote was not vitiated by the fact that one commissioner had been recused due to a legitimate conflict.

On the other hand, Stanley made a number of challenges. First, Stanley argued that the city's disciplinary action was prompted only by the first complaint. According to Stanley's attorney, the alleged misconduct, if any, occurred off duty. Therefore, because the city did not prove any adverse impact on its operations, its employees or its reputation, the city could not discipline Stanley for the aforementioned misconduct because it did not establish a direct relation between the misconduct and Stanley's job.

Second, Stanley focused on alleged procedural irregularities. Stanley challenged the city's failure to give him a copy of the various complaints as required by article 14, § G, of the agreement. He also challenged the fact that the four complaints relied upon by the department to justify his dismissal were more than five months old, again, a violation of the aforementioned provision. Stanley argued that these violations greatly prejudiced his ability to defend himself. He also challenged the denial of his request for a closed hearing. Last, Stanley alleged that the decision to discharge him violated § 68 of the city charter because the decision was made by a nonunanimous vote of the board.

those complaints were more than five months old at the time when the Board of Police Commissioners 'acted on' them [on August 6, 2002]."

Accordingly, the panel based its award on a procedural defect in the process followed by the city. The panel did not address the conduct issue. The panel noted that "there is ample evidence of some on duty misconduct and the same played a role in the City's decision to terminate Stanley." The panel did not award back pay, stating that "[w]hile we believe that [Stanley's] rights were violated, we do not feel that an award of back pay is warranted. Our conclusion is based on an examination of the record as a whole. Said evidence clearly establishes that [Stanley] was not exonerated of the charges brought by the state. Neither did he rebut the allegations made against him at the August 6 hearing. A preponderance of the evidence also establishes that a significant part of Officer Stanley's misconduct occurred while on duty, a factor not considered during his court proceeding. . . . Based on a preponderance of the evidence, the Panel also concludes that Officer Stanley used his position of authority to influence and intimidate the victims. He also violated the trust placed [in] him by the public since he preyed on their fear of his position as a police officer. The evidence also establishes that Stanley's statements were inconsistent, if not outright contradictory, at various stages of the Internal Affairs Investigation which made it look as if he was less than candid with the investigators and had something to hide. Besides that, Officer Stanley did not express remorse, though he admitted through counsel in court that he engaged in lewd and sexually charged conversations which were inappropriate, especially for an individual who is a police officer. Also of concern to the panel is the disturbing nature of Officer

Stanley's physical touching which, by credible accounts, was unsolicited, unwanted and rebuked and which, by his account, was intended to facilitate having sexual relations with the victims."

The city brings the present application to vacate the arbitration award, pursuant to § 52-418,[4] on four grounds. First, the award violates established public policy against sexual harassment. Second, the award usurps the authority of the board as set forth in the city charter, the agreement, the Ansonia police duty manual and General Statutes §§ 7-274 and 7-276. Third, the award conflicts with established and acceptable standard criminal investigation policy. Fourth, and finally, the award forces the department to notify any officer suspected of criminal misconduct within seven days of a complaint, regardless of the investigation.

Stanley has filed an answer to the city's application and a cross application to confirm the arbitration award. Both parties have filed memoranda of law in support of their respective applications.

The standard of review relative to arbitration awards depends on the nature of the challenge. The well established general rule is that "[w]hen the parties agree to arbitration and establish the authority of the arbitrator through the terms of their submission, the extent of our judicial review of the award is delineated by the scope of the parties' agreement. . . . When the scope

---

[4] Notably, while the city seeks to vacate the arbitration award on statutory grounds pursuant to General Statutes § 52-418, the city's challenge implicates only public policy, which is a common-law ground for vacating an award. Accordingly, because the city has failed to brief the statutory claim, the court will consider only the public policy grounds. Issues that are not briefed are considered abandoned. *Bridgeport Hospital* v. *Commission on Human Rights & Opportunities*, 232 Conn. 91, 115, 653 A.2d 782 (1995) ("[w]here an issue is merely mentioned, but not briefed beyond a bare assertion of the claim, it is deemed to have been waived").

of the submission is unrestricted, the resulting award is not subject to de novo review even for errors of law so long as the award conforms to the submission. . . . Because [the court] favor[s] arbitration as a means of settling private disputes, [the court] undertake[s] judicial review of arbitration awards in a manner designed to minimize interference with an efficient and economical system of alternative dispute resolution." (Citations omitted.) *Garrity* v. *McCaskey*, 223 Conn. 1, 4–5, 612 A.2d 742 (1992). Furthermore, in applying this general rule of deference to an arbitrator's award, "[e]very reasonable presumption and intendment will be made in favor of the [arbitral] award and of the arbitrators' acts and proceedings." (Internal quotation marks omitted.) *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, 237 Conn. 114, 119, 676 A.2d 825 (1996).

"Certain conditions do exist, however, under which [the court will] conduct a more searching review of arbitral awards." (Internal quotation marks omitted.) *Metropolitan District Commission* v. *Local 184*, 77 Conn. App. 832, 838, 825 A.2d 218 (2003). In *Garrity*, our Supreme Court recognized two narrow common-law grounds, as opposed to statutory grounds under § 52-418, for vacating an award rendered pursuant to an unrestricted submission. These grounds arise when the award (1) rules on the constitutionality of a statute or (2) violates clear public policy. *Garrity* v. *McCaskey*, supra, 223 Conn. 6. Only the second ground is involved in the present case.

When a challenge to a voluntary arbitration award rendered pursuant to an unrestricted submission raises a legitimate and colorable claim of violation of public policy, the question of whether the award violates public policy requires de novo judicial review. *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, 252 Conn. 416, 429, 747 A.2d 1017 (2000). The plaintiff's

challenge raises such a claim; accordingly, this court will undertake a de novo review of the award.

*Schoonmaker* has been interpreted to require a two step analysis in cases such as this in which a party raises the issue of a violation of public policy in an arbitration award. See *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 797, 758 A.2d 387, cert. denied, 255 Conn. 905, 762 A.2d 910 (2000). "First, [the court] must determine whether a clear public policy can be identified. Second, if a clear public policy can be identified, [the court] must then address the ultimate question of whether the award itself conforms with that policy." Id.

Under the foregoing analysis, the court first determines whether a clear public policy is implicated in the present case. The city contends that there is a clear public policy against sexual misconduct and sexual harassment, and in favor of appropriate moral and ethical standards for police officers as evidenced in state and federal law and in the duty manual of the department. Stanley, however, maintains that state and federal laws regarding sexual harassment do not apply to the facts of the present case as found by the arbitrators.

"[T]he question of public policy is ultimately one for resolution by the courts." *W. R. Grace & Co.* v. *Local Union 759, International Union of United Rubber, Cork, Linoleum & Plastic Workers of America*, 461 U.S. 757, 766, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983). This court's role "in addressing a public policy challenge [is] confined largely to determining whether, as gleaned from a statute, administrative decision or case law, there exists a public policy mandate with which an arbitral award must conform." *Schoonmaker* v. *Cummings & Lockwood of Connecticut, P.C.*, supra, 252 Conn. 428. Constitutions, statutes and applicable legal

precedent define public policy. *Stratford* v. *Local 134, IFPTE*, 201 Conn. 577, 590, 519 A.2d 1 (1986).

The United States Supreme Court has noted that the public policy exception is a narrow one. *United Paperworkers International Union, AFL-CIO,* v. *Misco, Inc.*, 484 U.S. 29, 43, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987); *W. R. Grace & Co.* v. *Local Union 759, International Union of United Rubber, Cork, Linoleum & Plastic Workers of America,* supra, 461 U.S. 766. A court may set aside an arbitration award only if (1) the collective bargaining agreement contains terms that violate public policy or (2) the arbitration award creates an explicit conflict with other " 'laws and legal precedents.' " *United Paperworkers International Union* v. *Misco, Inc.*, supra, 43. Here, there is no evidence that the terms of the agreement violate public policy; therefore, this court's inquiry turns on whether the arbitrators' award violates a clear public policy against sexual misconduct and sexual harassment.

The relevant inquiry here is not whether Stanley's conduct violates public policy but rather whether the arbitrators' decision to reinstate him violates public policy. See *Office of State Auditor* v. *Minnesota Assn. of Professional Employees,* 504 N.W.2d 751, 757 (Minn. 1993) ("while [the terminated employee's] *conduct* would appear to violate a well-defined and dominant public policy [the court] cannot automatically conclude that the arbitrator's *award* reinstating [the employee] violates that public policy" [emphasis in original]); see also *Eastern Associated Coal Corp.* v. *United Mine Workers of America District 17,* 531 U.S. 57, 62–63, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000) ("the question to be answered is not whether [the discharged employee's conduct] itself violates public policy, but whether the [award] to reinstate him does so").

It is indisputable that Connecticut recognizes a clear public policy against sexual misconduct and sexual

harassment. This public policy is evidenced in state criminal statutes, which provide that "[a] person is guilty of sexual assault in the fourth degree when . . . (2) such person subjects another person to sexual contact without such other person's consent . . . ." General Statutes § 53a-73 (a). Connecticut criminal statutes also proscribe stalking and harassment, offenses classified as misdemeanors. See General Statutes §§ 53a-181c, 53a-181d, 53a-181e and 53a-183.

In support of Connecticut's general public policy against sexual harassment, state and federal statutes recognize a well defined and dominant public policy against sexual harassment in the workplace. Both Title VII of the Civil Rights Act of 1964 and General Statutes § 46a-51 et seq., the Connecticut Fair Employment Practices Act, prohibit employers, including government agencies and political subdivisions, from engaging in sexual harassment. 42 U.S.C. § 2000e (2000) et seq.; General Statutes § 46a-51 et seq. Under Title VII, an employer has an affirmative duty to take action reasonably calculated to prevent sexual harassment in the workplace, particularly from employees who have committed acts of sexual harassment in the past. See, e.g., *Adler* v. *Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998) ("[t]he employer is, of course, obliged to respond to any repeat conduct; and whether the next employer response is reasonable may very well depend upon whether the employer progressively stiffens its discipline, or vainly hopes that no response, or the same response as before, will be effective"). General Statutes § 46a-60 (a) (8) provides in pertinent part: "It shall be a discriminatory practice in violation of this section . . . [f]or an employer, by the employer or the employer's agent, for an employment agency, by itself or its agent, or for any labor organization, by itself or its agent,

to harass any employee, person seeking employment or member on the basis of sex."[5]

It is also significant that, under federal law, there exists a clear public policy that imposes on governmental units an affirmative duty to take action to prevent sexual harassment and sexual misconduct by police officers. Section 1983 of Title 42 of the United States Code provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ." 42 U.S.C. § 1983 (2000). Under 42 U.S.C. § 1983, "a municipality that fails to take remedial action after having learned of repeated incidents of misconduct committed by a police officer may be deemed to have been deliberately indifferent to such misconduct and therefore liable to a victim. *Harris* v. *Pagedale*, 821 F.2d 499, 506 (8th Cir.) [cert. denied, 484 U.S. 986, 108 S. Ct. 504, 98 L. Ed. 2d 502 (1987)]. ([T]here was a pattern of sexual misconduct by City police officers . . . that on repeated occasions City officials in positions of authority and responsibility were notified of the offensive acts, but that upon receiving such notice, these City officials repeatedly failed to take any remedial action. . . . [T]his amounts to deliberate indifference to police abuses . . . [and the plaintiff] has proved the existence of a municipal custom suffi-

---

[5] For purposes of this section, "sexual harassment" is defined as "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (A) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (B) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (C) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment." General Statutes § 46a-60 (a) (8).

cient to support municipal liability under § 1983.).”
(Internal quotation marks omitted.) *Brooklyn Center* v.
*Law Enforcement Labor Services, Inc.*, 635 N.W.2d 236,
242 (Minn. App.), review denied, No. C5-01-414, 2001
Minn. LEXIS 803 (December 11, 2001). Thus, federal
public policy requires municipalities to take remedial
steps to prevent police officers from engaging in sexual
harassment, particularly where the offender has
engaged in a pattern of such misconduct. Id.

Connecticut statutes and the department's duty man-
ual recognize a clear public policy mandating good
behavior for police officers and requiring police officers
to be honest and law-abiding. See *Bridgeport* v. *Police
Dept. Employees Local 1159, Council 15, AFSCME,
AFL-CIO,* Superior Court, judicial district of Fairfield,
Docket No. CV 91 0281769S (May 16, 1994) (*Spear, J.*).
General Statutes § 7-276 provides in pertinent part that
police officers "shall hold office during *good behavior*
and until removed for cause upon written charges and
after hearing." (Emphasis added.) General Statutes § 7-
276. "Good behavior is a requirement for police offi-
cers." *South Windsor* v. *South Windsor Police Union*,
41 Conn. App. 649, 659, 677 A.2d 464, cert. denied, 239
Conn. 926, 683 A.2d 22 (1996).

The duty manual of the department, which emanates
from the statutory authority of § 7-276, requires police
officers to abide by the following standards of conduct.
Section 2.1.6, "Truthfulness," states: "[s]peak the truth
at all times and under all circumstances." Section 2.1.11,
"Civility," states: "be civil, orderly, diligent, discreet,
courteous and patient as a reasonable person is
expected to be in all situations . . . . Section 2.1.13,
"Oath of Office, Code of Ethics," states: "carry out [the
member's] oath of office and the code of police ethics
to the best of the member's ability." The duty manual
also prohibits the following conduct. Section 2.3.2,
"Conduct Unbecoming of An Officer," states: "conduct-
ing himself in a way which reflects discredit upon the

member as a police officer, or upon his fellow officers or the Police Department, or which tends to indicate that the officer is . . . unfit to continue as a member of the Police Department . . . ." Section 2.3.3, "Neglect of Duty," states: "conducting or omitting the performance of one's duty such that performance is not in accordance with the established and ordinary duties or procedures, or which constitutes use of unreasonable judgment in the exercising of any discretion granted to a police officer." Section 2.3.22, "Duty Time Limited To Police Work," states: "conducting personal business while on duty or devoting any of his on 'duty time' to any activity other than that which relates to police work . . . ."

Thus, there is a clear, well defined public policy in both the private and public sector against sexual misconduct and sexual harassment.

Having found such clear public policies, this court must now consider whether Stanley's reinstatement, which is the result of the panel's interpretation of the agreement, contravenes these clear public policies. The city argues that the panel's award violates the clearly defined public policy against sexual harassment and sexual misconduct by "allowing Earl Stanley a police officer's badge." The city contends that Stanley's reinstatement should not be permitted in this case where Stanley: (1) has conditionally admitted to fourth degree sexual assault; (2) has been found to have used his position as a police officer to harass and intimidate victims; (3) has been found to have touched his victims even though such action was unsolicited, unwanted and rebuked; and (4) has admitted his actions were intended to facilitate sexual relations with the victims.

Stanley, however, maintains that he did not admit guilt as to the charge of sexual assault in the fourth

degree, but admitted that he had sexually charged conversations with S and touched her. Stanley argues that the award concerns the criminal charges brought against him only for conduct that occurred "off duty." Furthermore, Stanley contends that "there is no statute or law that brings this incident within the purview of any sexual harassment statute or policy." This court disagrees.

Our Supreme Court has stated that "[a] challenge that an award is in contravention of public policy is premised on the fact that the parties cannot expect an arbitration award approving conduct which is illegal or contrary to public policy to receive judicial endorsement any more than parties can expect a court to enforce such a contract between them. . . . When a challenge to the arbitrator's authority is made on public policy grounds, however, the court is not concerned with the correctness of the arbitrator's decision but with the *lawfulness of enforcing the award.* . . . Accordingly, the public policy exception to arbitral authority should be narrowly construed and [a] court's refusal to enforce an arbitrator's interpretation of [collective bargaining agreements] is limited to situations where the contract as interpreted would violate some explicit public policy that is well defined and dominant, and is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. . . . The party challenging the award bears the burden of proving that illegality or conflict with public policy is clearly demonstrated. . . . Therefore, given the narrow scope of the public policy limitation on arbitral authority, the plaintiff can prevail . . . only if it demonstrates that the [arbitrators'] award clearly violates an established public policy mandate." (Citations omitted; emphasis added; internal quotation marks omitted.) *South Windsor* v. *South*

*Windsor Police Union Local 1480, Council 15,* 255 Conn. 800, 815–16, 770 A.2d 14 (2001).

Here, the panel specifically found that a significant part of Stanley's misconduct occurred while on duty. Based on the preponderance of the evidence, the panel found that he "used his position to influence and intimidate the victims" and "violated the trust placed [in] him by the public since he preyed on their fear of his position as a police officer." Furthermore, the panel found that Stanley was "less than candid" with the investigators and expressed no remorse for his lewd and sexually charged conversations and unsolicited, unwanted and rebuked physical touching of the complainants. Despite these clear findings of sexual harassment and misconduct, the panel ordered Stanley's reinstatement as a police officer because of a nonprejudicial procedural violation.

Thus, this court finds that state and federal statutes, case law and the duty manual of the department clearly evidence a well defined and dominant public policy against sexual harassment and sexual misconduct as well as a clear public policy requiring good conduct by police officers. This court further finds that these public policies are implicated in the present case by the fact that this matter involves a police officer charged with engaging in sexual harassment and misconduct while performing his duties as a police officer. Of significance are Stanley's repeated transgressions in engaging in sexual misconduct and sexual harassment. To allow Stanley to continue to work as a police officer for the city of Ansonia would be directly at odds with dominant public policies supported by clear law and legal precedent. Thus, the award of reinstatement imposed by the panel unequivocally violates the well established public policy against sexual harassment and sexual misconduct and the clear public policy requiring good conduct by police officers. The court finds that the city has

shown that the award clearly violates established public policy.

For the foregoing reasons, the plaintiff city's application to vacate the award is granted. Defendant Stanley's application to confirm the award is denied.