******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## AARON M. ZWEIG *v.* THE MARVELWOOD SCHOOL
### (AC 42660)

Alvord, Elgo and Devlin, Js.

*Syllabus*

The plaintiff sought to recover damages from the defendant for, inter alia, his allegedly wrongful discharge from employment. The trial court granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. The plaintiff asserted that genuine issues of material fact existed as to whether the defendant's termination of his employment violated public policy for the protection of children. The plaintiff was employed by the defendant independent school as a history teacher and he also served as the defendant's Director of Food Studies, a role that required him to establish and maintain a garden on campus and use it to teach a class on food studies. In May, 2015, the plaintiff objected to the defendant's suggestion that telephone poles that had been treated with creosote, a pesticide and wood preservative, be used to make raised beds in the garden because he believed that the chemical posed a health risk to himself and his students. Following the dispute, the plaintiff was relieved of his duties relating to the garden but remained employed as a teacher at the school, entering into at-will employment agreements with the defendant in July, 2015, and April, 2016. In September, 2016, the plaintiff's employment was terminated. *Held* that the trial court properly granted the defendant's motion for summary judgment because no genuine issue of material fact existed as to whether the plaintiff set forth a valid wrongful discharge claim: the plaintiff failed to demonstrate that his dismissal occurred for a reason that violated public policy because it did not violate any explicit statutory or constitutional provision, as there were no state or federal regulations prohibiting the use of creosote-treated wood, and it did not violate any judicially conceived notion of public policy, as, although the courts may have recognized a public policy of protecting children in their prior interpretations of child protection statutes, they have not articulated any judicially conceived notion of public policy relating to the protection of children; moreover, the public policy exception to the at-will employment doctrine is narrow, requiring conduct that violates a clearly articulated public policy, as a broad interpretation would impair the exercise of managerial discretion and render the at-will employment doctrine meaningless; furthermore, even if this court assumed that the defendant's conduct violated public policy, the plaintiff could not have prevailed on his claim because he failed to satisfy his burden of demonstrating a causal connection between his allegedly protected activity and the discharge of his employment, as the defendant's decision to enter into employment contracts with the plaintiff in July, 2015, and April, 2016, despite the May, 2015 dispute, broke the causal connection between the dispute and the plaintiff's September, 2016 termination of employment.

Argued March 5, 2020—officially released April 20, 2021

*Procedural History*

Action to recover damages for, inter alia, the allegedly wrongful termination of the plaintiff's employment, and for other relief, brought to the Superior Court in the judicial district of Litchfield, where the court, *Shaban, J.*, granted the defendant's motion for summary judgment and rendered judgment thereon, from which the plaintiff appealed to this court. *Affirmed.*

*Thomas W. Meiklejohn*, with whom, on the brief, was *Henry F. Murray*, for the appellant (plaintiff).

*Daniel A. Schwartz*, with whom were *Christopher E.*

*Engler* and, on the brief, *Gary S. Starr*, for the appellee (defendant).

*Opinion*

ELGO, J. The plaintiff, Aaron M. Zweig, appeals from the summary judgment rendered by the trial court in favor of the defendant, The Marvelwood School, in this action for wrongful discharge. On appeal, the plaintiff claims that the court improperly determined that no genuine issue of material fact existed as to whether he set forth a valid wrongful discharge claim. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, viewed in the light most favorable to the plaintiff, and procedural history are relevant to this appeal. The defendant is an independent boarding school for grades nine through twelve, plus a postgraduate year. In June, 2012, the plaintiff executed an at-will employment contract with the defendant for the 2012–2013 school year as a history teacher, as well as a newly created position titled "Director of Food Studies." The latter position required the plaintiff to establish a garden on campus and use it to teach a class on food studies.[1] The plaintiff also was responsible for maintaining the garden and, like other faculty at the school, he was responsible for supervising sports, community service activities and the dormitory. The plaintiff subsequently executed similar employment contracts for the 2013–2014 and 2014–2015 school years, which required him to teach three classes, coach sports for two seasons, continue as Director of Food Studies, serve as head of the community service program and continue with dormitory supervisory responsibilities.

In the spring and summer of 2014, the defendant's headmaster, Arthur Goodearl, expressed to the plaintiff his concern that the garden, which was located at the entrance to the campus, was not being maintained properly. The plaintiff responded that maintenance staff had not been helpful in his requests for assistance. Goodearl recommended that he engage students for this work, a suggestion that the plaintiff considered impractical because "teenagers . . . aren't necessarily interested in hard labor . . . ."

On May 22, 2014, Alicia Winter, a parent of students enrolled at the school who also had expressed concerns about the garden, sent an e-mail to Goodearl with suggestions for improving its appearance, which were then forwarded to the plaintiff. In an e-mail exchange on June 4, 2014, Winter sent photographs of telephone poles on her property, which she offered to donate for use in the garden, but advised that they would probably need to be lined because they were filled with creosote.[2] The plaintiff responded that "they seem a bit big and heavy. And with the creosote, maybe [it's] best not to use them. Not really sure how to even get them into the garden."

In an at-will employment agreement dated February 21, 2015 (February, 2015 contract), Goodearl offered the plaintiff employment for the 2015–2016 school year

as Director of Food Studies at an annual salary of $45,900, which represented a 1.6 percent increase in salary. The plaintiff's responsibilities would have required him to teach four instead of three classes, as well as to continue to coach for two seasons and to serve as the head of the community service program. The agreement specified that "[r]esponses must be received on or before April 3, 2015. After which, those who have not signed & returned the agreement, may have their position made available to any other qualified applicants." The plaintiff never signed the February, 2015 contract.

On April 7, 2015, Goodearl advised the plaintiff of his intention to offer Winter the position of "Garden Manager." Winter accepted the offer to fill that role on April 19, 2015, thereby reducing the plaintiff's responsibilities as Director of Food Studies. As Garden Manager, Winter went forward with her plan to build raised beds for the garden using the donated telephone poles, which were delivered to the campus on or after May 7, 2015.

On May 15, 2015, the plaintiff e-mailed Goodearl and informed him that he objected to the use of the telephone poles to make raised beds "because they are made with carcinogenic chemicals that leech into the soil." The plaintiff further indicated his preference to make raised beds out of pine or cedar "because they do not put cancer in the soil." In response, Goodearl stated in relevant part: "Regarding the poles, [Winter] has used them for years, but [she] is researching to make sure that there is no adverse effect. Your comment about putting cancer into the soil is gratuitous in the extreme, and frankly, unworthy of you." The plaintiff then sent a reply e-mail to Goodearl, in which he stated: "[Y]ou may feel that protecting our community from known sources of cancer is 'unworthy' of my efforts, but I feel as though preventing cancer and known poisons from our environment is a duty." Winter thereafter decided not to use the telephone poles for the garden and arranged for their removal.

In an e-mail dated June 15, 2015, Goodearl advised the plaintiff that he had not yet signed the February, 2015 contract, which at that point had expired. In his e-mail response on June 25, 2015, the plaintiff stated that he was aware that he had not signed his contract and that he had considered resigning his position. He asked Goodearl whether he would consider discussing a part-time position. Following negotiation with Goodearl and given assurances that he would maintain his health insurance, the plaintiff signed a new at-will employment agreement (2015–2016 Agreement) on July 14, 2015, for a full-time position that required him to teach four classes and administer the community service program. That agreement, which provided for an annual salary of $37,000, also eliminated his responsibilities for the Food Studies program and reduced his dormitory duties and coaching responsi-

bilities.

Approximately nine months later, the plaintiff executed another at-will employment contract (2016–2017 Agreement)[3] with the defendant for the 2016–2017 school year. That agreement included the same terms as the 2015–2016 Agreement, with two exceptions: the plaintiff's community service obligation was eliminated and his annual salary was increased to $38,000.

Approximately five months later, on September 6, 2016, the defendant terminated the plaintiff from its employ, and this wrongful discharge action followed. The plaintiff filed a two count amended complaint against the defendant in September, 2017. In count one, the plaintiff alleged that the defendant had "reduced the plaintiff's pay because he opposed the use of carcinogens in the defendant's vegetable garden."[4] In count two, the plaintiff alleged that the defendant had terminated his employment for the same reason.[5] The plaintiff alleged that both adverse employment actions "violate[d] the public policy of the state of Connecticut."

On March 30, 2018, the defendant filed a motion for summary judgment as to both counts of the complaint on the ground that the plaintiff had failed to establish "an important public policy which supports his claim."[6] On September 4, 2018, the court heard oral arguments on the defendant's motion. In its subsequent memorandum of decision, the court granted the defendant's motion for summary judgment because "the plaintiff . . . failed to identify any explicit public policy contained in an applicable statute, regulation, constitutional provision, or judicial decision that was violated by the defendant . . . ." The plaintiff thereafter filed a motion to reargue the decision, which the court denied, and this appeal followed.

The issue presented in this appeal by the plaintiff is whether the court properly granted the defendant's motion for summary judgment on the ground that the plaintiff failed to demonstrate as a matter of law that his dismissal occurred for a reason violating public policy. "The standards governing our review of a trial court's decision to grant a motion for summary judgment are well established. Practice Book [§ 17-49] provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. . . . In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party seeking summary judgment has the burden of showing the absence of any genuine issue [of] material facts which, under applicable principles of substantive law, entitle [him/her] to a judgment as a matter of law . . . and the party opposing such a motion must provide an evidentiary foundation to demonstrate the exis-

tence of a genuine issue of material fact. . . . A material fact . . . [is] a fact which will make a difference in the result of the case." (Internal quotation marks omitted.) *Romprey* v. *Safeco Ins. Co. of America*, 310 Conn. 304, 312–13, 77 A.3d 726 (2013). "When a court renders summary judgment as a matter of law, our review is plenary, and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Armshaw* v. *Greenwich Hospital*, 134 Conn. App. 134, 137, 38 A.3d 188 (2012).

"In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary. Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." (Internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, 260 Conn. 691, 697–98, 802 A.2d 731 (2002). However, in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 475, 427 A.2d 385 (1980), our Supreme Court recognized an exception to the at-will employment doctrine: a common-law cause of action for wrongful discharge exists "if the former employee can prove a demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." (Emphasis omitted.) Id. As our Supreme Court subsequently explained, the "public policy exception . . . carved out in *Sheets* attempts to balance the competing interests of employer and employee. Under the exception, the employee has the burden of pleading and proving that his dismissal occurred for a reason violating public policy. The employer is allowed, in ordinary circumstances, to make personnel decisions without fear of incurring civil liability. Employee job security, however, is protected against employer actions that contravene public policy." *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 679, 513 A.2d 66 (1986). "The question of whether a challenged discharge violates public policy . . . is a question of law to be decided by the court . . . ." (Internal quotation marks omitted.) *Geysen* v. *Securitas Security Services USA, Inc.*, 322 Conn. 385, 407, 142 A.3d 227 (2016).

"Given the inherent vagueness of the concept of public policy, it is often difficult to define precisely the contours of the exception." *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680. Although *Sheets* and its progeny recognize a claim for wrongful termination in appropriate cases, our Supreme Court has "repeatedly . . . underscored . . . that the public policy exception to the general rule allowing unfettered termination of an at-will employment relationship *is a narrow one . . . .*" (Emphasis added; internal quotation marks omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 701. Indeed, the court in *Sheets* emphasized that "courts should not lightly intervene to impair the

exercise of managerial discretion or to foment unwarranted litigation." *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 477. Consequently, our Supreme Court has "rejected claims of wrongful discharge that have not been predicated upon an employer's violation of an important and clearly articulated public policy." *Thibodeau* v. *Design Group One Architects, LLC*, supra, 701. Thus, in evaluating wrongful termination claims, a reviewing court must "look to see [1] whether the plaintiff has . . . alleged that his discharge violated any explicit statutory or constitutional provision . . . or [2] whether he alleged that his dismissal contravened any judicially conceived notion of public policy." (Internal quotation marks omitted.) *Faulkner* v. *United Technologies Corp.*, 240 Conn. 576, 581, 693 A.2d 293 (1997).

I

On appeal, the plaintiff concedes that the defendant's conduct does not violate any explicit statutory or constitutional provision.[7] The plaintiff also does not dispute the absence of state or federal regulations prohibiting the use of creosote-treated wood and concedes that discarded telephone poles are exempt from regulation as a hazardous waste. Instead, the plaintiff seeks to bring his claim within the narrow confines of *Sheets* and its progeny by asserting that Connecticut courts have "judicially recognized a public policy in the protection of children." The plaintiff relies on *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680, which states in dicta an exception to the at-will employment doctrine where an employee alleges that his or her dismissal contravened a "judicially conceived notion of public policy." The plaintiff contends that judicial decisions that have "recognized the public policy of protecting children," as articulated in, for example, General Statutes § 17a-101,[8] constitute the basis for a judicially conceived notion of public policy, the violation of which can serve as an exception to the at-will employment doctrine.[9] We disagree.

In *Sheets*, our Supreme Court declined to address "whether violation of a state statute is invariably a prerequisite to the conclusion that a challenged discharge violates public policy." *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 480. At the same time, the court observed that "when there is a relevant state statute we should not ignore the statement of public policy that it represents." Id. Relying on *Sheets* and its progeny, the defendant argues that "courts should not impute a statement of public policy beyond [the] express statutory language." See also *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 408–409.

Even if we were to accept the plaintiff's premise that the exemption of the reuse of creosote from state and federal environmental regulation is not fatal to his *Sheets* claim, we first note that the plaintiff misstates the standard articulated in *Morris*.[10] The court in *Morris*

stated in dicta that an employer could be liable for wrongful termination if the discharge violated "any judicially *conceived* notion of public policy." (Emphasis added.) *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680. In his brief, the plaintiff justifies his foray into invoking public policy language from case law that applies child protection statutes by repeatedly asserting that "[t]here is a judicially *recognized* public policy of protecting children" in a wide range of circumstances. (Emphasis added.)

This distinction between a judicially conceived notion and a judicially recognized one is not mere semantics. Although we are not aware of any appellate court cases that have found an exception to the at-will employment doctrine based on a violation of a "judicially conceived notion of public policy," our courts routinely "recognize" public policy in interpreting statutes. See, e.g., *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996) (in discerning legislative intent, courts "look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation and [common-law] principles governing the same general subject matter" (internal quotation marks omitted)). Nevertheless, although our courts may appropriately recognize and consider public policy, particularly as an aid to statutory construction, this function can in no way be construed as "conceived" by our courts.[11]

We emphasize this distinction because much of the authority on which the plaintiff relies for his contention that there is a judicially recognized policy of protecting children draws from child protection statutes. See *Ward* v. *Greene*, 267 Conn. 539, 560, 839 A.2d 1259 (2004) (in considering public policy underlying § 17a-101, court rejected claim that all children are encompassed in class of persons referenced therein); *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 798–99, 801–802, 758 A.2d 387 (court relied on public policy underlying General Statutes §§ 17a-90 (a), 17a-101 (a), 17a-114 (b), and 17a-115 in considering authority of commissioner to terminate Department of Children and Families employee convicted of drug offenses), cert. denied, 255 Conn. 905, 762 A.2d 910 (2000); *Bridgeport* v. *National Assn. of Government Employees, Local R1-200*, Superior Court, judicial district of Fairfield, Docket No. CV-94-0311951 (August 2, 1994) (12 Conn. L. Rptr. 271) (rejecting claim that arbitration award reinstating school custodian violated public policy expressed in § 17a-101). Our examination of these cases reveals that, although the court may have "recognized" the public policy expressed by child protection statutes, the court did not articulate *judicially* conceived notions of public policy. Rather, as is self-evident, the public policy in question emanated not from our courts, but from the statutes themselves and

were thus conceived and promulgated by our legislature.

Numerous Supreme Court decisions since *Morris* demonstrate that, whatever the court suggested in dicta regarding judicially conceived notions of public policy, public policy exceptions to the at-will employment doctrine arising from statutes nonetheless must allege violations specific to those provisions. As our Supreme Court has explained, generalized statements of public policy contained in our statutes "should not be read to provide a broader public policy mandate than that which is represented." *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 408. Although we note that the plaintiff fails to mention the references to child protection statutes such as § 17a-101 (a) in his citation to cases in which courts have "recognized" the public policy to protect children, this does not obviate the fact that the legislature, and not the courts, determined the public policy articulated therein. The plaintiff's characterization of those cases as examples of judicially conceived notions of public policy as contemplated by *Morris*, therefore, is untenable.

Moreover, in its admonition that a wrongful discharge action must allege a violation of an explicit statutory or constitutional provision, our Supreme Court has specifically rejected a more explicit attempt to invoke § 17a-101 (a) in a wrongful discharge action based on a violation of the public policy expressed therein. See *Daley* v. *Aetna Life & Casualty Co.*, 249 Conn. 766, 802, 734 A.2d 112 (1999). In *Daley*, an employee brought an action for wrongful discharge alleging, inter alia, that her employer terminated her because she advocated for flexible schedules for working parents. Id., 772–74. She alleged that the public policy contained in a variety of statutes—including § 17a-101 (a), the Connecticut Family and Medical Leave Act, General Statutes § 31-51kk et seq., and the federal Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq.—not only required employers to provide flexible work schedules, but also prohibited discrimination against employees pursuing these arrangements. Id., 799–801. Although our Supreme Court acknowledged that each of the statutes regulates workplace conduct to some degree, noting that § 17a-101 (a) includes the reporting and investigation obligations of certain professionals, the court nevertheless emphasized that "[n]one of these statutes requires that an employer accommodate employee requests for flexible work schedules." Id., 802.

In rejecting general public policy statements as a basis for wrongful discharge actions, the Supreme Court reiterated that courts "do not lightly intervene to impair the exercise of managerial discretion or to foment unwarranted litigation." (Internal quotation marks omitted.) Id., 802–803. "In declining to recognize an important public policy to that effect, we are mindful

that we should not ignore the statement of public policy that is represented by a relevant statute. . . . Nor should we impute a statement of public policy beyond that which is represented. To do so would subject the employer who maintains compliance with express statutory obligations to unwarranted litigation for failure to comply with a heretofore unrecognized public policy mandate." (Citation omitted.) Id., 804.

In *Thibodeau* v. *Design Group One Architects*, *LLC*, supra, 260 Conn. 706, our Supreme Court similarly reaffirmed the principle that general statements of public policy in our statutes are an insufficient basis for a wrongful discharge action. The plaintiff in that case alleged that she was wrongfully discharged by her employer, the defendant, in violation of the public policy against pregnancy discrimination outlined in the Fair Employment Practices Act, General Statutes § 46a-51 et seq. *Thibodeau* v. *Design Group One Architects*, *LLC*, 64 Conn. App. 573, 574, 781 A.2d 363 (2001), rev'd, 260 Conn. 691, 802 A.2d 731 (2002). That statute, however, only applied to employers with three or more employees and the defendant admittedly employed only two individuals. Id., 575. The defendant successfully moved for summary judgment on the ground that the exemption was an expression of public policy against claims like that raised by the plaintiff. Id. On appeal, this court disagreed and reversed the judgment of the trial court in favor of the defendant, observing that the statute "announced a general public policy against sex discrimination in employment"; id., 584; and that "the language, history and public policy underlying the act . . . reflect a cognizable legislative and societal concern for eliminating discrimination on the basis of sex in Connecticut." Id., 586. Although it conceded that the statute exempted small employers like the defendant from pregnancy discrimination claims, this court concluded that the statute's statement of public policy, at most, was "simply to limit the statutory remedy, but [was] not an affirmative policy to exempt . . . small employers from . . . discrimination suits." (Internal quotation marks omitted.) Id., 587.

The defendant then appealed to the Supreme Court, which reversed the judgment of the Appellate Court, concluding that "the exemption contained in the act for employers with fewer than three employees is, itself, an expression of public policy that cannot be separated from the policy reflected in the act's ban on discriminatory employment practices." *Thibodeau* v. *Design Group One Architects*, *LLC*, supra, 260 Conn. 706. As the court rhetorically asked: "Why would the legislature have exempted small employers from the act unless it had concluded, as a policy matter, that such employers should not be required to defend against sex discrimination claims, notwithstanding this state's general public policy against sex discrimination?" Id., 718. The court thus concluded that it saw "no reason why the legisla-

ture would have excluded small employers from the act unless it had decided, as a matter of policy, that such employers should be shielded from liability for employment discrimination, including sex and pregnancy-related discrimination. . . . The legislature may wish to revisit its policy judgment regarding small employers. We, however, are not free to ignore the clear expression of public policy embodied in the statutory exemption currently afforded small employers under the act." Id.

We are also not persuaded that *Ruiz* v. *Victory Properties*, *LLC*, 315 Conn. 320, 107 A.3d 381 (2015), or *Hanford* v. *Connecticut Fair Assn.*, 92 Conn. 621, 103 A. 838 (1918), have any application to our jurisprudence in wrongful termination cases involving at-will employment. The primary issue in *Ruiz* involved "whether public policy [supported] the imposition of a [legal] duty" in the context of a negligence case involving attractive nuisances on a landowner's property. (Internal quotation marks omitted.) *Ruiz* v. *Victory Properties*, *LLC*, supra, 323, 337. *Hanford* likewise is inapplicable because it merely stands for the proposition that a contract to hold a baby show during the 1916 "infantile paralysis" epidemic[12] was void because holding the event "would [have been] highly dangerous to the health of the community" and, thus, contrary to public policy. *Hanford* v. *Connecticut Fair Assn.*, supra, 622–23.

Although the plaintiff acknowledges that these cases do not involve exposure of children to creosote or any carcinogen, he argues that public policy "is not limited to narrowly defined circumstances." *Ruiz* and *Hanford*, however, did not address public policy in the context of the at-will employment doctrine, which presents countervailing public policy concerns that we are not free to ignore.

As our Supreme Court repeatedly has emphasized, *Sheets* is a narrow, not a broad, exception to the at-will employment doctrine. See, e.g., *Thibodeau* v. *Design Group One Architects*, *LLC*, supra, 260 Conn. 700–701; *Parsons* v. *United Technologies Corp.*, 243 Conn. 66, 79, 700 A.2d 655 (1997). By circumscribing the parameters of the public policy exception, our Supreme Court has underscored the principle that, when its conduct violates some clearly articulated public policy, an employer forgoes its otherwise unfettered right to terminate an employee in an at-will employment relationship. The logic underlying this requirement is obvious. In those instances where the legislature has clearly spoken, the impropriety of the alleged conduct is, as a matter of law, not in dispute. See *Geysen* v. *Securitas Security Services USA*, *Inc.*, supra, 322 Conn. 407 ("[t]he question of whether a challenged discharge violates public policy . . . is a question of law to be decided by the court" (internal quotation marks omitted)). Thus, notwithstanding "the inherent vagueness

of the concept of public policy," which renders the contours of exceptions, as the court in *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680, observed, "often difficult to define precisely," the requirement that violations assert some "explicit statutory or constitutional provision"; *Faulkner* v. *United Technologies Corp.*, supra, 240 Conn. 581; ensures that an employer is effectively and constructively apprised of the improper conduct. As our Supreme Court noted in *Daley* v. *Aetna Life & Casualty Co.*, supra, 249 Conn. 804, "absent [a] clear breach of public policy, the employer must be allowed to make personnel decisions without fear of incurring civil liability." (Internal quotation marks omitted.) To do otherwise "would subject the employer who maintains compliance with express statutory obligations to unwarranted litigation for failure to comply with a heretofore unrecognized public policy mandate." Id.

Furthermore, actions that are premised on conduct that is alleged to violate public policy founded on general statements, rather than on clearly proscribed conduct, run the risk that our courts will be faced with arbitrating the merits of the alleged public policy itself. The present case, if it were permitted to advance to trial, illustrates precisely why our Supreme Court has foreclosed litigation of at-will employment cases that fall short of alleging violations of a clearly articulated public policy. Because the plaintiff concedes, as he must, the absence of state or federal statutes or regulations prohibiting the use of creosote in telephone poles used in garden beds, the plaintiff's proffer of the opinions of experts and statements in agency brochures effectively seeks to have the court litigate the merits of his public policy claim.[13] These sources, however, are opinions subject to dispute, such that the defendant would be entitled to challenge with its own experts and evidence the degree to which creosote is unsafe and whether it was reasonable for the defendant to be dismissive of the plaintiff's concerns because it relied on Winter's belief that, if dry and/or lined, creosote telephone poles did not pose a risk to students.

Permitting a plaintiff to litigate conduct that is not clearly proscribed by statute would eviscerate the underlying premise of the at-will employment doctrine. "Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability." *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 697–98. The purpose of the at-will employment doctrine is to "preserve the autonomy of managerial discretion in the work place and the freedom of the parties to make their own contract." *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 563, 479 A.2d 781 (1984). As our Supreme Court emphasized in *Sheets*, "courts should not lightly intervene" into the motivations behind an employer's termination of an at-will employee. *Sheets*

v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 477. To adopt the plaintiff's argument in the present case would "impair the exercise of managerial discretion" and render the at-will employment doctrine meaningless. Id. For that reason, anything less than an express violation of a statutory or constitutional mandate would undermine the salutary purpose of balancing the right of an employee to have a remedy for clear violations of public policy and the right of the employer to managerial discretion as contemplated by *Sheets*.

"[J]ust as the primary responsibility for formulating public policy resides in the legislature . . . so, too, does the responsibility for determining, within constitutional limits, the methods to be employed in achieving those policy goals." (Citations omitted.) *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 715. "In areas where the legislature has spoken . . . the primary responsibility for formulating public policy must remain with the legislature." *State* v. *Whiteman*, 204 Conn. 98, 103, 526 A.2d 869 (1987); see also *Sic* v. *Nunan*, 307 Conn. 399, 410, 54 A.3d 553 (2012) (declining to recognize duty of "drivers to keep their wheels pointed in a particular direction when stopped at an intersection waiting to turn" in part because "it is undisputed that the legislature, which has the primary responsibility for formulating public policy . . . has not seen fit to enact any statutes requiring [such conduct]" (citation omitted; internal quotation marks omitted)); *General Motors Corp.* v. *Mulquin*, 134 Conn. 118, 132, 55 A.2d 732 (1947) ("it is for the legislature, which is the arbiter of public policy, to determine what [public policy] shall be"); *New Haven Metal & Heating Supply Co.* v. *Danaher*, 128 Conn. 213, 222, 21 A.2d 383 (1941) ("the legislature determines the public policy of the state"); *State* v. *Gilletto*, 98 Conn. 702, 714, 120 A. 567 (1923) ("[t]he legislature is the arbiter of public policy"); *Nichols* v. *Salem Subway Restaurant*, 98 Conn. App. 837, 846, 912 A.2d 1037 (2006) ("[t]he legislature speaks on matters of public policy through legislative enactments and through the promulgation of regulations by state agencies as authorized by statute" (internal quotation marks omitted)).

Moreover, "[t]he wisdom of deferring questions of public policy to the legislature is exemplified by the problems that judicial intervention would create . . . ." *Burnham* v. *Administrator, Unemployment Compensation Act*, 184 Conn. 317, 325, 439 A.2d 1008 (1981). The plaintiff relies on an Environmental Protection Agency report, which classifies creosote as a "probable human carcinogen." United States Environmental Protection Agency, "Chemical Assessment Summary: Creosote; CASRN 8001-58-9," (last modified December 3, 2002), p. 2, available at https://iris.epa.gov/static/pdfs/0360_summary.pdf (last visited April 7, 2021). Although such a report might be influential to a legislative determination of public policy, it does not establish that the

substance offends a clearly articulated public policy. We therefore decline the plaintiff's invitation to "[exceed] our constitutional limitations by infringing on the prerogative of the legislature to set public policy through its statutory enactments." *State* v. *Reynolds*, 264 Conn. 1, 79, 836 A.2d 224 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004); see also *Tannone* v. *Amica Mutual Ins. Co.*, 329 Conn. 665, 684 n.7, 189 A.3d 99 (2018) (noting distinction between court articulating public policy versus "*vindicating* our legislature's public policy, articulated in state statute" (emphasis in original)); *Schofield* v. *Loureiro Engineering Associates, Inc.*, Superior Court, judicial district of Waterbury, Docket No. CV-14-6024702-S (March 9, 2017) (64 Conn. L. Rptr. 252) ("[i]n the absence of a clearly articulated judicially conceived notion of public policy on the issues presented . . . this court will not re-write existing statutes").

We agree with the plaintiff that, as a general matter, protecting the health and welfare of children is an important public policy. The plaintiff nonetheless bore the burden of demonstrating that his discharge was "predicated upon an employer's violation" of a "clearly articulated public policy." *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 701. In advancing his claim that the defendant violated public policy, the plaintiff relies on case law premised on statutes promulgated by our legislature and, thus, not conceived by the court. As such, we are bound by *Sheets* and its progeny that public policy embodied in our statutes "should not be read to provide a broader public policy mandate than that which is represented." *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 408. We therefore conclude that the trial court properly determined that no genuine issue of material fact exists as to whether the plaintiff set forth a valid wrongful discharge claim because the defendant's conduct does not violate any statutory or constitutional provision or any judicially conceived notion of public policy.

II

Even if we were to conclude that the defendant's conduct constituted a violation of public policy, the plaintiff still could not prevail. The defendant argues, as an alternative ground for affirmance, that the plaintiff has failed to demonstrate a genuine issue of material fact as to whether his termination was caused by his May, 2015 objection to the defendant's attempted use of creosote.[14] We agree.

Under the *Sheets* doctrine, one of the elements the plaintiff must prove for wrongful discharge is causation—"that is, that the discharge occurred for a reason violating public policy." *Sophia* v. *Danbury*, 116 Conn. App. 68, 74–75, 974 A.2d 804 (2009). This causation requirement is reflected in the text of *Sheets* itself, because the court required the plaintiffs to "prove a

demonstrably improper reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." (Emphasis omitted.) *Sheets* v. *Teddy's Frosted Foods, Inc.*, supra, 179 Conn. 475. If the employee is terminated for other reasons unrelated to the claimed public policy violation, then no wrongful discharge claim will lie against the employer. But see *Li Li* v. *Canberra Industries*, 134 Conn. App. 448, 457, 39 A.3d 789 (2012) (reversing grant of employer's motion for summary judgment on wrongful discharge claim because discharge occurred within months of protected activity).

A common-law cause of action for wrongful discharge "logically should be analyzed in the same framework as a statutory cause of action" for wrongful discharge. Id., 455. "Statutory actions for wrongful discharge typically follow the analytic route outlined in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Under this analysis, the plaintiff has a minimal burden of establishing a prima facie case by showing that he or she engaged in a protected activity or otherwise fell within the protection of the statute, that he or she was subsequently discharged, and that there was a causal connection between the two. If a prima facie showing is made, the burden of going forward shifts to the employer to demonstrate a permissible reason for the termination of employment. If the employer's burden of going forward is satisfied, the plaintiff has the ultimate burden of proving by the preponderance of the evidence that the employer's reason is pretextual or, even if true, [that] the improper reason likely motivated the employer in the decision to terminate." *Li Li* v. *Canberra Industries*, supra, 134 Conn. App. 454.

The defendant argues that the plaintiff failed to establish the element of causation. More specifically, it contends that the plaintiff cannot establish that his reduction in pay and termination was causally related to the May, 2015 dispute over his objection to the use of creosote in light of the undisputed fact that the defendant thereafter renewed the plaintiff's employment contract for both the 2015–2016 and 2016–2017 school years. We agree.

In the present case, the facts are undisputed that the defendant's remarks evidencing hostility to the plaintiff's concerns regarding creosote occurred in e-mails exchanged in May, 2015. Prior to that exchange, the defendant offered to renew the plaintiff's employment for another year on February 15, 2015, with an annual salary of $45,900, representing a 1.6 percent increase in salary and a commensurate increase in responsibilities. The plaintiff does not dispute that he was aware of the contract offer and allowed it to lapse according to its terms on April 3, 2015, an event occurring prior to the May, 2015 e-mail exchange.[15] Instead, the plaintiff

admitted that he had considered resigning his position and asked for the defendant to consider a part-time position. Following discussions with Goodearl and given assurances that he would maintain his health insurance, the plaintiff signed a new contract on July 14, 2015, for a full-time position, which included responsibility for teaching four classes and administering the community service program. The agreement also included the elimination of his responsibilities for the Food Studies program and a reduction of dormitory duty to one evening per week and coaching responsibility to one season instead of two for an annual salary of $37,000.

It is also undisputed that the defendant subsequently entered into yet another at-will employment contract[16] with the plaintiff for the 2016–2017 school year on April 8, 2016. That agreement included the same terms as the prior year with the exception of responsibility for community service, which was eliminated, and the increase of the plaintiff's annual salary to $38,000.

As the defendant correctly observes, the plaintiff chose to allow the February offer to lapse on April 3, 2015, and the defendant, as an at-will employer, was under no obligation to renew its offer. The defendant nevertheless did so and the plaintiff subsequently entered into a new at-will employment contract on July 14, 2015, for the 2015–2016 year, the terms of which were negotiated between him and the defendant. In the absence of duress, fraud or mutual mistake, which is not claimed here, the agreement between the plaintiff and the defendant under negotiated terms is the sine qua non of contract. Because both parties entered into the contract freely, any claim that the defendant reduced the plaintiff's salary or terminated the plaintiff in September, 2016, because of the intervening May, 2015 dispute defies logic. If any inference can be reasonably made relative to the May, 2015 dispute, it is that the defendant rehired the plaintiff despite that dispute. That decision, and the renegotiation and renewal of the subsequent 2016–2017 employment agreement, operate to break the causation connection between the May, 2015 incident and the plaintiff's eventual termination in September, 2016.[17]

Accordingly, we agree that the plaintiff has failed to demonstrate a genuine issue of material fact as to whether his termination was caused by his objection to the defendant's attempted use of creosote. The court, therefore, properly rendered summary judgment in favor of the defendant.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The plaintiff previously was employed by the defendant as a teacher from 2005 until 2010. In the fall of 2010, the plaintiff left his position with the defendant to obtain a master's degree in food studies.

[2] Creosote is a pesticide used as a wood preservative. See United States

Environmental Protection Agency, "Ingredients Used in Pesticide Products: Creosote," (last modified December 15, 2016), available at https://19january2-017snapshot.epa.gov/ingredients-used-pesticide-products/creosote_.html (last visited April 7, 2021).

[3] All of the plaintiff's prior annual employment contracts with the defendant were at will.

[4] At oral argument on the motion for summary judgment, the defendant argued that count one does not allege any legally recognized tort because the common-law exception to at-will employment articulated in *Sheets* v. *Teddy's Frosted Foods, Inc.*, 179 Conn. 471, 476, 427 A.2d 385 (1980), only applies to wrongful discharge, not to reduction in pay. The trial court declined to address that argument because the defendant raised this issue for the first time at oral argument and not in its pleadings.

[5] The plaintiff also alleged that he was wrongfully terminated because he (1) "opposed policies that condoned failure to fulfill community service obligations" and (2) "called upon the defendant to take adequate steps to discourage drug and alcohol use by minors." The court granted the defendant's motion for summary judgment as to those alternative grounds, and the plaintiff does not challenge the propriety of that determination in this appeal.

[6] The defendant raised several other grounds in support of its motion for summary judgment, contending that (1) there was no evidence of a "causal connection between [the plaintiff's] May 15, 2015 e-mail in which he complained about the use of creosote treated telephone poles . . . and his 2015–2016 contract terms"; (2) the time gap between his 2015 e-mail objecting to creosote and later employment contracts "is too great a time gap to permit an inference of retaliation"; and (3) the defendant "had a legitimate, nonretaliatory reason for [the plaintiff's] termination." Because the court granted the defendant's motion for summary judgment for lack of an explicit public policy, it declined to address those alternative grounds.

[7] In the absence of any state or federal statutory provisions that prohibit the defendant from reusing a creosote-treated telephone pole for gardens, the plaintiff submitted government studies on creosote in opposition to the defendant's motion for summary judgment. For example, the plaintiff relies on a 2002 brochure from the Agency for Toxic Substances and Disease Registry (ATSDR), an agency within the United States Department of Health and Human Services, which states that "exposure to coal tar creosote . . . may harm you . . . ." Agency for Toxic Substance and Disease Registry, "Public Health Statement: Creosote," (September 2002), p. 1, available at https://www.atsdr.cdc.gov/ToxProfiles/tp85-c1-b.pdf (last visited April 7, 2021). The plaintiff also relies on an Environmental Protection Agency report, which classifies creosote as a "probable human carcinogen," and found a "well-documented carcinogenicity of other coal tar [creosote] products to humans." United States Environmental Protection Agency, "Chemical Assessment Summary: Creosote; CASRN 8001-58-9," (last modified December 3, 2002), p. 2, available at https://iris.epa.gov/static/pdfs/0360_summary.pdf (last visited April 7, 2021). The defendant counters that the Environmental Protection Agency study "do[es] not discuss the hundreds of other employees who were similarly exposed to creosote for whom there were apparently no reported incidents of cancer," and that the ATSDR brochure does not establish that limited creosote exposure poses a significant risk of cancer. We deem it unnecessary to rule on this dispute because, even if it were properly before this court, these studies do not bear on the issue before us, as they do not address whether the reuse of creosote-treated wood violates federal or state law. Although the sources for materials like an agency brochure and academic study might be influential to a legislative determination of public policy, these materials standing alone do not establish a violation of a statutorily based public policy.

[8] General Statutes § 17a-101 (a) provides: "The public policy of this state is: To protect children whose health and welfare may be adversely affected through injury and neglect; to strengthen the family and to make the home safe for children by enhancing the parental capacity for good child care; to provide a temporary or permanent nurturing and safe environment for children when necessary; and for these purposes to require the reporting of suspected child abuse or neglect, investigation of such reports by a social agency, and provision of services, where needed, to such child and family."

[9] See, e.g., *Ward* v. *Greene*, 267 Conn. 539, 558, 839 A.2d 1259 (2004) ("[t]he public policy concerns inherent in the present case are of profound importance, namely, the protection of children's health and welfare, which may be affected adversely through injury and neglect"); *State* v. *AFSCME, Council 4, Local 2663, AFL-CIO*, 59 Conn. App. 793, 795, 798–99, 758 A.2d

387 (arbitration award reinstating Department of Children and Families bus driver convicted of drug offenses violated public policy to protect children in state custody), cert. denied, 255 Conn. 905, 762 A.2d 910 (2000); *Bridgeport* v. *National Assn. of Government Employees, Local R1-200*, Superior Court, judicial district of Fairfield, Docket No. CV-94-0311951 (August 2, 1994) (12 Conn. L. Rptr. 271) (rejecting claim that arbitration award reinstating school custodian violates public policy expressed in § 17a-101).

[10] The plaintiff's assertion that *Magnan* v. *Anaconda Industries, Inc.*, 193 Conn. 558, 479 A.2d 781 (1984),"is the only decision of the Connecticut Supreme Court to find wrongful termination based upon 'judicially conceived notions of public policy' in the absence of a specific statute" mischaracterizes the court's analysis and holding. In *Magnan*, the plaintiff was terminated for refusing to sign a statement that he claimed was an inaccurate account of his complicity in another employee's theft of company property. Id., 560–61. As an at-will employee, the plaintiff brought an action in two counts: (1) breach of the implied covenant of good faith and fair dealing and (2) wrongful discharge based on retaliation for his refusal to sign an untrue statement. Id., 573. With respect to the first count, which the jury found for the plaintiff, the court rejected the proposition that the requirement of good faith and fair dealing be transformed into "an implied condition that an employee may be dismissed only for good cause" in an at-will employment relationship. Id., 559, 571. In so doing, it observed that "[t]o hold otherwise would render the court a bargaining agent for every employee not protected by statute or collective bargaining agreement . . . ." Id., 571. Notably, it deferred to our legislature to determine what categories of employment should be given protection and what criteria should determine whether good cause exists for discharge, observing that "the General Assembly may deal . . . more comprehensively [with such questions] than the courts." Id., 572. In citing *Sheets*, it specifically declined "to enlarge the circumstances under which an at-will employee may successfully challenge his dismissal" beyond the violation of an important public policy. Id. Having set aside the verdict on the first count, the court addressed the second count, for which the jury returned a verdict for the defendant. Id., 573. In reviewing the jury instructions as to that count, the court observed that the underlying factual underpinnings for the first and second counts were essentially the same and remanded the case for a new trial on the second count on the basis of its conclusion that the jury verdicts were inconsistent. Id., 576–78. Although the second count was premised on the question of whether the defendant's conduct violated some important public policy, specifically whether the defendant terminated the plaintiff for his refusal to sign a statement that the defendant knew not to be true, the court did not specifically characterize this discharge as constituting a violation of a "judicially conceived notion of public policy." In fact, that language emerged for the first time two years later as dicta with no analysis or discussion in *Morris* v. *Hartford Courant Co.*, supra, 200 Conn. 680. Although our Supreme Court has recited the "judicially conceived notion of public policy" exception to the at-will employment doctrine in subsequent decisions; see *Geysen* v. *Securitas Security Services USA, Inc.*, supra, 322 Conn. 408; *Thibodeau* v. *Design Group One Architects, LLC*, supra, 260 Conn. 699; *Faulkner* v. *United Technologies Corp.*, supra, 240 Conn. 581; it has not had occasion to be interpreted or applied by our appellate courts in the context of at-will employment wrongful discharge cases.

[11] See 2B N. Singer & J. Singer, Statutes and Statutory Construction (7th Ed. 2020) § 56:1 ("'Public policy' is a vague and indefinite concept not susceptible of application as a precise rule of decision, yet often serves as a shorthand reference for a wide variety of factors which may influence and condition the formation, validation, interpretation, and application of legislation. Precise identification, particularization, and definition of relevant policy considerations is helpful to clarify issues in particular cases. Courts locate public policy considerations by examining a statute's history, purpose, language and effect." (Footnotes omitted.)).

[12] The infantile paralysis was caused by polio. See 30 S. Williston, Contracts (4th Ed. 2004) § 77:72, p. 496.

[13] For example, the defendant contends that not only does the opinion of the plaintiff's expert, Jeffrey Cordulack, fail to establish that creosote use in garden beds is proscribed under state or federal law, but also that Cordulack's report should not be considered because "[Cordulack] has not been qualified as an expert. His undergraduate degree is in forestry, not a relevant field, and he has no advanced degrees." Moreover, in rendering his opinion that the use of creosote-treated telephone poles in organic gardens "is an unwise and unsafe decision," Cordulack relies on the United States

Environmental Protection Agency statement that "[c]reosote is not approved to treat wood for residential use, including landscaping timbers or garden borders." United States Environmental Protection Agency, "Ingredients Used in Pesticide Products: Creosote," (last modified December 15, 2016), available at https://19january2017snapshot.epa.gov/ingredients-used-pesticide-products/creosote .html (last visited April 7, 2021). In response, the defendant claims that "the reuse of creosote-treated wood is not subject to federal regulation under pesticide laws." In its decision, the trial court noted that, under Connecticut law, discarded creosote-treated wood is specifically exempted from the definition of hazardous waste under the Resource Conservation and Recovery Act of 1976, 42 U.S.C. § 6901 et seq. (2018), "because of an existing exemption [codified] at 40 [C.F.R.] § 261.4 (b) (9) . . . ." (Internal quotation marks omitted.) See also General Statutes § 22a-115 (1) (A). These competing contentions illustrate not only that the use of creosote in garden beds is subject to dispute, but also that the very nature of the dispute is one that is quintessentially a matter to be resolved by the legislature and the executive branch.

[14] The defendant properly preserved that alternative ground in its motion for summary judgment before the trial court.

[15] On June 15, 2015, Goodearl e-mailed the plaintiff about the fact that he had not signed the February, 2015 contract, indicating that he would be away from June 23, 2015, through the next weekend and that they should set a time to discuss the matter. On June 22, 2015, Goodearl contacted the plaintiff stating that the contract offer was "so far beyond the due date" that it was no longer valid. On June 25, 2015, the plaintiff replied by e-mail, "I am aware that I did not sign my contract, and have been discussing with Sunny what will be best for myself and my family. I was of the mind to resign from my position at Marvelwood, as I did not have an enjoyable year and thought it would be best. However, Bing and Sunny would both like me to stay, and suggested that perhaps a part-time contract might be more conducive to my situation. If you are interested in discussing a part-time position, I would be willing to meet either Monday or Tuesday of next week. Let me know what time works well, or if offering a revised contract is something that is not possible."

[16] As discussed in footnote 3 of this opinion, all of the plaintiff's prior annual employment contracts with the defendant were at will, each with a term beginning on July 1 and concluding on June 30 of the given contract year.

[17] We also note that the May, 2015 dispute between the parties occurred nearly sixteen months before his termination. As the United States Court of Appeals for the Second Circuit has explained, "[t]he causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (Internal quotation marks omitted.) *Lovejoy-Wilson* v. *NOCO Motor Fuel, Inc.*, 263 F.3d 208, 224 (2d Cir. 2001). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action"; *Gorman-Bakos* v. *Cornell Cooperative Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001); "[i]n the Second Circuit and district courts within the Second Circuit, time periods *greater than one year* have been found, in general, to be insufficient to establish this temporal relationship." (Emphasis added.) *Wilks* v. *Elizabeth Arden, Inc.*, 507 F. Supp. 2d 179, 196 (D. Conn. 2007). The uncontroverted fact that the dispute between the parties regarding creosote occurred sixteen months *prior* to the defendant's termination of the plaintiff's employment further undermines the plaintiff's claim that the September 6, 2016 termination of his employment was caused by that dispute.